Helen S. Reed, et al., Plaintiffs-Appellants, v. The Texas Company, et al., Defendants-Appellees.

Term No. 59–F–19.

Fourth District.
July 2, 1959.
Released for publication July 17, 1959.

W. C. Pearce, John C. Robison, of Fairfield, for appellants.

Barth, Phillips, Phebus & Tumelson, of Urbana, Dilsaver and Gilkerson, of Mattoon, John M. Jones, of Danville, Philip R. Wimbish, of Tulsa, Rusnak and Deutsch, of Chicago, Feirich & Feirich, of Carbondale, George V. Dole, of Paris, for appellees.

PRESIDING JUSTICE SCHEINEMAN delivered the opinion of the court.

This is a suit for injunction, brought by three owners of a portion of the oil rights in a certain reservoir of oil in Wayne County, known as the South Aden Pool, against The Texas Company (hereafter called the Company) and some 30 individuals, besides Unknown Owners, as the other owners of oil rights in the same pool.

The purpose of the injunction was to require the discontinuance of a repressure program which consisted of forcing water, under pressure, into the oil pool to increase the flow of oil from producing wells. This process is known in the industry as "secondary" production, to distinguish it from "primary" production,

which is the natural flow of oil caused by the inherent pressure that originally existed in the pool.

The defendant company is the operator of the oil pool and had developed the field by drilling various wells, collecting and marketing the oil, and accounting to the royalty owners according to their respective rights. The company and other defendants answered the complaint asserting, in substance, that the operation in force was according to law, and without it the royalty owners would suffer great financial loss. The plaintiffs contend that the operation entails the migration of oil, that oil to which they have "title" is being forced to flow to wells owned by others, that they have not consented to unitization of the field, and that it is not a legal operation without such an agreement.

The Chancellor heard the testimony of the plaintiffs in person and of engineers expert in the science of oil production, and also received in evidence a mass of statistical data concerning the physical conditions of the pool and the production history of each and every well drilled therein, from its start to the time of the suit. The prayer for injunction was denied, and this appeal followed. It was originally taken to the Supreme Court on the ground that constitutional questions, and freeholds, were involved. These claims were resolved against appellants and the cause was transferred to this court.

It is not feasible to detail the testimony and statistics in this opinion, but for the purpose of indicating the problem involved, a history of the total production in the pool is here given. The figures are not in dispute, but it must be observed that this is a composite of statistics for the entire pool, in which there was never any uniformity in the flow from separate wells, nor in the several leaseholds, nor in the rate of decline from the initial flow of each well.

The development of this pool began in the thirties, and by October of 1938 the production was about 650 barrels per day. Thereafter the combination of decline in flow from existing wells, and the bringing in of new wells, caused ups and downs in the average daily, monthly, and annual production rates of the whole field, and which varied in the several leaseholds therein. The general trend was upward, because of new wells, so that the total production from the whole field reached a peak in November of 1943, of about 1250 barrels per day.

During the ensuing five years the trend of production was downward, reaching its low point in the latter part of 1948, when the total production from the pool fell to about 275 to 280 barrels per day. While some wells were still profitable, others were at or approaching the point of no return. One well which happened to be on a leasehold wholly owned by plaintiffs, got down to a rate of about one barrel per day. This well had been in operation for about three years, but had not yet produced enough to pay for its cost.

 The experts are agreed that there is no method known which will serve to capture all of the oil in place, but, when the natural pressure has decreased, the modern device of repressuring can serve to recover a great deal more of the oil. It is a matter of common knowledge that this invention has been used in abandoned fields, sometimes to produce more oil by the secondary method than the total procured in primary production.

During this declining period in the South Aden Pool, the company sought to use secondary methods under a unitizing agreement. Such an agreement would permit operation of the field as a unit, with total production allocated among leases according to a fixed ratio, regardless of which wells are actually producing. Under this method, an operator may inject gas, water, or

other fluid, at one edge of the pool and as succeeding rows of wells allow escape of the pressure without profitable quantities of oil, they may be capped or converted to input. In effect, the oil is swept from the pool so that the last profitable production is on the opposite side, but royalties are paid according to the agreed ratio.

One of the plaintiffs refused to enter such an arrangement, which effectively blocked the proposal to unitize, as to the entire pool. The company was faced with the continued down trend in production, coupled with the fact that the wells were producing large amounts of salt water. This could not legally be disposed of by allowing it to run off in streams to the damage of other land, it was necessary to dispose of it on the leaseholds. This was an increasing operation expense, in spite of the decline in production, which eventually left only 22% of the maximum attained in 1943.

In 1946 the company experimented in the disposition of the water by pumping it back into the underground reservoir under pressure. Production was not affected for some time, but in the latter part of 1948, after the low point had been reached, the pressure began to have a noticeable effect, and production began to rise. Thereupon the company's engineers devised and put into operation a repressuring system without unitization. This involved placing injection wells around the periphery and others in the interior area of the pool. The latter were spotted as close to boundaries of leaseholds as was practical, so as to diffuse the pressure and minimize the migration of oil from one leasehold to another.

There resulted a substantial rise in production in 1949. After that additional wells were added to the injection system from time to time, to maintain pressure and to equalize the ratio of production from the

135

several leaseholds with the ratio that existed during primary production. The overall uptrend continued until October of 1955 when it reached its peak of 1350 barrels per day, thus surpassing the peak production under primary operation. Thereafter, production again declined, and in September of 1957 the pool got down to an average of 450 barrels a day.

The above history is sufficient to indicate the serious results which would flow from an injunction prohibiting a repressure program. In other respects the evidence is conflicting. There are some discrepancies in statistics, but the main disagreement lies in the expert opinion testimony. Without attempting to set forth all the disputes, the problems of law are here considered.

It is asserted by plaintiffs that a repressure program cannot be used except by and under the unitization type of contract. No authority supports such a view, at least in this state, and two cases indicate the opposite result: Ramsey v. Carter Oil Co., 74 F. Supp. 481; Carter Oil Co. v. Dees, 340 Ill. App. 449. In both cases there was objection to the use of secondary methods of production, in neither was there any unitization agreement. Nevertheless, both courts held that it was an implied right, and even a duty, for a reasonably prudent operator to adopt a repressuring system for the secondary recovery of oil. In the Ramsey case the plan was disapproved because there was testimony that the method then in use was driving off commercial quantities of oil from one leasehold to others. There was also testimony that the company proposed to remedy this by causing other oil to be driven back in equal amount. The court rejected this as being conjecture.

In the Dees case it was stipulated that the company's plan would result in driving oil onto the leasehold equal to that driven off. Therefore, it was held

that the plan was reasonable and proper, and there being no damage resulting, the plan could be put into effect.

■ If a minority of one or more persons affected by the operation could prevent it by refusing to join in the agreement, they could then force the others to choose between leaving a large part of the oil underground, or consent to granting the dissidents an unreasonably large percentage of the oil. In other words, the power to block a repressure program by refusing to sign the unitization agreement, would be the power to insist upon unjust enrichment. Surely a court of equity should not support such a rule.

It is next contended that at least some of the plaintiffs are owners of land on the surface, therefore they have "title" to the oil under it. In the Dees case, this court held that the discussion of questions of title to the oil was irrelevant. This is clearly the modern trend of authority. See, Summers, Law of Oil and Gas, Chapter 4, 1954 edition. The author quotes extensively from Ohio Oil Co. v. Indiana, 177 U. S. 190, 44 L. Ed. 729. For a terse summary of the confused state of Oil Law, because of difficulties in the problem of title thereto, see 24 Am. Jur., Oil and Gas, Sec. 3, et seq. The difficulty arises because the courts necessarily recognize that oil is migratory, or, as often said, it is fugacious. For this reason it has been said there can be no such thing as absolute title to oil underground. Poe v. Ulrey, 233 Ill. 56, 84 N. E. 46; Triger v. Carter Oil Co., 372 Ill. 182, 23 N.E.2d 55; Updike v. Smith, 387 Ill. 600, 39 N.E.2d 325. See also, Meyers, Law of Pooling and Unitization, p. 39 and 379–480.

■ Counsel's argument about title seems to assume that the operator must have an absolute duty to prevent any migration of oil, even though it is compensated by other oil. In support of the argument, they cite the duty of an operator to place off-set wells to prevent

waste and wholesale loss of oil to adjacent wells. It would be most unusual for an off-set well to produce exactly the same quantity of oil as its twin across the boundary of the leasehold. The argument seems to assume that each molecule of oil underground will carefully wend its way to the outlet on its own side of a boundary line some thousands of feet above. The mere statement of the assumption should suffice to show its fallacy. We conceive the law to be that an operator must be reasonably diligent to prevent waste, and to prevent any substantial *loss* of oil, but that the absolute prevention of any movement of oil underground across a boundary line is not humanly possible. If the oil moving off one lease is compensated by a substantially equal amount from the same pool, there is no actual loss.

It may be noted that, in the citation to Professor Summers' work, this author gives his opinion that "Such terms as absolute ownership, qualified ownership and the rule of capture should disappear from the language of judicial decisions involving the landowner's legal interest in oil and gas."

Regardless of the judicial attitude, the legislature has now made it the policy of this state to provide for secondary recovery of oil. Ill. Rev. St., Chap. 104, Par. 89.

As to whether the plan in this case was reasonable and fair to all parties, there is a dispute, but the Chancellor heard the testimony, therefore, this court looks only to the question whether there is sufficient evidence to support the result. The evidence for the defendants shows the company took the year 1949 as the break off point between primary and secondary production, since that was the year the pressure took substantial effect. They compiled the total production figures for each separate leasehold, from its first de-

velopment to 1949 as being primary, and from 1949 to 1957 as secondary. For each of the three leaseholds in which plaintiffs have an interest, the figures for the two periods are about equal. More important is the ratio of these respective totals to the total for the entire pool during the same periods.

 As to these three leaseholds the results shown in this manner are: Heaton lease, primary recovery was 25.7 percent of the pool total, secondary recovery 27.3 percent. Silverman lease, primary 44.3%, secondary, 46.9%. Stone lease, primary 8.15%, secondary, 8.16%. Based on these figures, the Chancellor was certainly justified in finding the plan reasonable and fair.

Even if there were some deviations of importance, this court would be reluctant to hold that the entire project must be enjoined. It would seem more reasonable to require that any substantial defect be remedied. This might present some difficulty, if it required court supervision, which is not entirely practical. That difficulty no longer exists in this state, for the following reason:

For years this state has had in effect statutes concerning conservation of oil and gas resources. Ill. Rev. St. Ch. 104; 26 ILP, "Mining, Oil and Gas," Sec. 112. Since the decisions in the Ramsey and Dees cases, supra, the legislature has added provisions to the statute, Par. 62, et seq., which specifically recognize the propriety of secondary recovery by the use of gas, water, air, or other fluid, to restore pressure, if done in a reasonable and fair manner; and the supervision and control thereof is assigned to the Mining Board. Thus the details of operations are now supervised and controlled by an administrative agency, as it should be, subject to judicial review.

In this case, the plan adopted by the company was approved by the Board, and each injection well was

139

separately licensed. The Chancellor properly found that the injunction prayed for should not be granted, and the decree is affirmed.

Decree affirmed.

CULBERTSON, J., concurs.

HOFFMAN, J., took no part.