(No. 29804.-■)

ALBERT N. SPIES *vs.* FRANK DEMAYO *et al.*—(ALBERT N. SPIES *et al.*, Appellants, *vs.* SAMUEL J. DRESSOR *et al.*, Appellees.)

*Opinion filed January 22, 1947.*

M. J. BROWN, of Hillsboro, and HERBERT W. DEY, of Litchfield, for appellant Albert N. Spies; CALVIN & KIM-

BRELL, of Kansas City, Mo., for appellants Frank De-Mayo *et al.*

GLEN B. WILSON, and ROBERT F. SMITH, both of Greenville, for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

A decree of the circuit court of Bond county adjudged a warranty deed, dated July 9, 1924, from Albert N. Spies and his wife, Isadore, to Samuel J. Dressor an absolute conveyance of the property and not a mortgage, reformed the deed to include a tract, four by nine rods, and determined the respective rights of several parties to $1127.64, representing the proceeds of the sale of 1252.92 barrels of oil produced from an oil well on the small strip. From this decree, Spies prosecutes a direct appeal. Five defendants have joined in the appeal and filed a separate brief relating to one branch of the case.

From the pleadings and the evidence it appears that, on January 28, 1920, Albert N. Spies purchased approximately 134 acres of land in Bond county from Henry Otto for $8000. He paid $4000 in cash and borrowed another $4000, securing his indebtedness by a mortgage on the farm. Thereafter, he borrowed $4000 from the Federal Land Bank of St. Louis, this indebtedness being secured by a mortgage on the farm, and, from the proceeds, fully paid his original mortgage debt. Without narrating details, Spies found himself in serious financial difficulties in the summer of 1924. On July 9, 1924, he owed G. W. Merry, familiarly referred to as "Pud" or "Pude," approximately $3600, evidenced by a promissory note signed by Spies. Merry was demanding better security. Spies owed $2800 to the Bradford National Bank of Greenville, represented by notes for $2300 and $500. At this time, Spies was in default on a quarterly installment of principal on his debt to the Federal Land Bank. He also owed

lesser sums to other persons. During this period of financial stress, a grand jury investigation involving a forgery charge against Spies was in progress. No indictment was returned against him. In addition to the farm property, Spies owned personal property worth about $1800. Placing a generous valuation of $8000 on the farm, his assets were insufficient to meet his obligations and, indeed, he was in arrears in payments on each of the loans described. At this juncture, on July 8, 1924, Spies, accompanied by Herman Riedemann, an officer of the bank, repaired to the home of Samuel J. Dressor, seeking the latter's financial assistance. A conference followed, the participants being Dressor and his wife, Christiana, a sister of Spies, Riedemann, Spies and his wife, and his attorney, the professed purpose being to persuade Dressor to come to his brother-in-law's financial rescue. There was much discussion and many conferences of two or more of the persons thus far named. The net result was that Riedemann prepared a warranty deed conveying the farm to Dressor. Riedemann apparently did not have in his possession the correct legal description of the land plaintiff then owned. The small strip, four by nine rods, comprising 7/32 of an acre, was omitted from the description of the property. The next day, July 9, a justice of the peace, Lafayette Busby, took the deed to Spies. He and his wife executed the deed and, also, a chattel mortgage note for $2300 secured by a chattel mortgage on personal property belonging to Spies, consisting of live stock, farm equipment, growing crops, household furnishings, and 10,000 feet of hard lumber. Several promissory notes were signed at this time. It appears that, on July 8, 1924, Dressor, Spies and the latter's wife, executed a note payable to the order of the Bradford National Bank for $2300, due 180 days after date and that, on the day named, a credit of $500 was entered on the note, the payment being made by Dressor. A second note, dated July 8, 1924, for $500, payable to the order of the bank,.

was signed by Spies and his father, Charles Spies. A sale of the property described in the chattel mortgage took place on October 6, 1924, and, from the proceeds of the sale, amounting to $1814.07, $1000 was applied as a credit on the chattel mortgage note by Dressor. The balance of the proceeds of the sale was applied to expenses of the sale and attorney's fees. Dressor also paid $1000 to the Bradford National Bank on October 6, 1924, and this amount was credited on the note. Possession of the farm was given to Dressor shortly after the chattel mortgage foreclosure sale. Dressor, together with his family, occupied the farm as its owner, paid all taxes, made contracts with tenants, and executed oil and gas leases. On January 5, 1925, the note for $500, signed by plaintiff and his father, Charles Spies, was combined with the balance on the $2300 note, and a renewal note for $1300, payable 180 days after date, was executed by plaintiff, his wife and Dressor. When this note became due on July 8, 1925, Dressor and his wife renewed it but Spies did not sign the renewal note. In due course, Dressor paid this note in full. From the foregoing, it appears that the notes to the Bradford bank originally totaling $2800 were satisfied by Dressor paying $1800 out of his own funds, and applying $1000 from the chattel mortgage sale. Plaintiff personally made no payments on these notes. It further appears that on September 16, 1924, Dressor joined with Spies, his wife, his father, and four others in signing a note payable to the order of G. W. Merry for $3637.18, and that, subsequently, Dressor paid about $1200 on this note. There is no competent evidence in the record that Dressor was repaid this $1200, either in whole or in part. In addition, Dressor assumed the Federal Land Bank mortgage indebtedness, paid all interest thereon, and satisfied taxes and insurance requirements until March 8, 1941, when he sold the land to his son, Sherman S. Dressor.

The evidence warrants the statement that there was no discussion with respect to the legal description of the property incident to the execution of the deed. Spies testified, "I knew I was signing a deed," and that he "sure" thought it was on his farm. He also knew that the small tract, four by nine rods, was a part of the farm. Isadore McCullah (Spies's wife in 1924) testified to the same effect, expressing her understanding that the farm was "to be turned over to Dressors." Spies did not assert any right of dominion over the property until shortly before commencing this litigation on June 10, 1942. Indeed, the evidence discloses that he had not been on the farm until after filing the complaint. Distance was not a deterrent as he lived nearby and knew that an oil well was being drilled on the property. During this long interval, he never talked with Dressor concerning the matter of redeeming the property. As he puts it, he did not discuss the deed during this time, did not claim it was a mortgage, never offered to pay him (Dressor) any money nor talked with him about redeeming and, further, at no time, told anyone about the deed being a mortgage. When asked if the first time he ever claimed the deed to be a mortgage in equity was in the complaint filed in this action, Spies replied in the negative. To the further query, "Did you claim it before that time?" he answered, "Yes, in my own mind. You don't have to claim it to anybody else." He testified further that while the well was being drilled he did not make it known that he had any interest in the property and made no objection to anyone drilling on his land.

Between the execution of the deed in July, 1924, and the hearing commencing in November, 1944, Dressor's wife, with whom he consulted before entering into the challenged transaction, died. Riedemann is now deceased, as is the justice of the peace who took the deed to Spies and his wife for their signatures and acknowledgment. The agent who acted for Merry, and Merry himself, have

both died, and Spies's father, a cosigner on at least two notes, is also now deceased. Of those present and involved in the negotiations, Dressor, eighty-one years of age when he testified, his son, Sherman, who manages his business affairs, Spies and his former wife, are the only persons remaining who can throw any light upon the disposition of plaintiff's financial troubles in the summer of 1924. Sherman Dressor testified that his father's hearing was impaired, that he was nervous and "you might say his memory is gone." Sherman Dressor was a boy sixteen years of age in 1924. Isadore McCullah, wife of Spies on July 9, 1924, testified that her recollection of the transaction was "dim."

In the interim, on August 11, 1937, Dressor and his wife executed an oil and gas lease to Frank DeMayo covering the entire farm, including the four-by-nine-rod tract. On January 24, 1938, Dressor and his wife sold and conveyed by mineral deed to Emanuel J. Coyle an undivided one-half interest in and to the oil, gas and other minerals underlying the entire farm. Coyle, in turn, conveyed to William J. Connors and Raymond Moore. On August 19, 1939, DeMayo released of record the oil and gas lease which he had obtained from Dressor and, on September 7, 1939, Dressor and his wife executed an oil and gas lease covering the entire farm to H. McClure. This last lease was subsequent to the date on which Coyle had acquired a one-half interest in the oil and gas underlying the farm, but the lease was not signed by Coyle. The lease to McClure was, in turn, assigned to the Bond County Oil Company on October 21, 1939. In the summer of 1939, the Bond County Oil Company, organized by DeMayo and C. Grosscurth, caused a well to be drilled on the four-by-nine-rod tract located at the extreme northwest corner of the farm. It was drilled to a depth of 1854 feet and approximately 1200 barrels of oil were produced. Three hundred barrels were sold to the Pana Refining Company

at Pana, Illinois, all shipments being made between November 8, 1939, and March 27, 1940. No other oil was sold. The Pana Refining Company, before paying the Bond County Oil Company for the oil delivered to it, requested DeMayo to furnish an abstract of title covering the premises involved. Upon examining the abstract furnished by DeMayo, the Pana Refining Company refused to pay the Bond County Oil Company for seven-eighths of the oil delivered to it because Coyle had an interest in the oil produced from the property. The sole reason advanced for refusing to pay for the oil was that Coyle owned one half of the minerals underlying the property and that he had not leased his interest to the Bond County Oil Company. There is no claim by the Pana Company that the well was not located on the property apparently belonging to Dressor. Upon failing to effect a settlement with Coyle, DeMayo caused surveys to be made to determine whether the four-by-nine-rod tract could be construed as a part of the adjacent farm owned by Albert Wade. Wade himself never asserted any claim of ownership of the strip. DeMayo, at this time, had a lease on all of Wade's land. Wade died in 1942 after this action was instituted, but his son, Lester Wade, testified that his father never claimed the four-by-nine-rod tract on which the well was located. Nor did the witness, his brothers and sisters claim it. DeMayo testified that operations were stopped since the litigation was instituted in 1942. The evidence is to the effect, however, that operations had long since ceased, the last shipment of oil being to the Pana Refining Company on March 27, 1940, more than two years before plaintiff filed his complaint. Initial production from the well dropped from seventy to two barrels per day. DeMayo's pumper, Clifford Cruthis, testified that when he quit the well was producing from one to three barrels of oil and twenty barrels of water a day.

As recounted, Samuel J. Dressor sold all his remaining interest in the land to his son, Sherman, in 1941. The description in this deed was likewise erroneous. While making financial arrangements attending this purchase, Sherman Dressor discovered the error in the deed from plaintiff to Samuel Dressor. When asked to execute a quitclaim deed to him containing the correct legal description, Spies declined because Sherman Dressor, in turn, declined to become surety on a note for $300.

The evidence has been set forth at sufficient length to furnish adequate background for a summary of the pleadings and a consideration of the issues presented for decision in the trial court and upon this appeal. On June 10, 1942, the plaintiff, Albert N. Spies, filed his complaint in an action at law against the defendants, Frank DeMayo, Albert Wade, H. McClure, Samuel J. Dressor, Sherman S. Dressor, Emanuel J. Coyle, C. Grosscurth, the Bond County Oil Company, Pana Refining Company, and twenty-five others. The complaint consisted of three counts. Of these, the first sought damages of $2500 representing the reasonable value of the crude oil produced from the oil well on the tract in controversy between September 1, 1938, and June 10, 1942. The second and third counts sought damages in the same sum for oil produced from the well on the property, the second count alleging that plaintiff was entitled to immediate possession of the four-by-nine-rod tract. The Pana Refining Company answered and tendered $857.64, the amount due for oil received from the premises, expressing its willingness to pay this sum to the rightful owners. The defendants, Samuel J. and Sherman S. Dressor, Emanuel J. Coyle, and their wives, and six others, filed a joint answer denying the material allegations of plaintiff's complaint. They also filed what is denominated as their "First, Second and Third Counterclaim." The gist of the allegations of their first counterclaim, so far as

relevant, is that plaintiff intended to convey to Samuel J. Dressor all of the land he acquired from Henry Otto; that the scrivener inaccurately described the property, and that a mutual mistake was made in describing the property in the warranty deed executed July 9, 1924, in the unintentional omission from the conveyance of a tract nine rods long and four rods wide, containing 7/32 of an acre, an integral part of the land plaintiff intended to be conveyed by him. Accordingly, defendants asked that the deed from plaintiff and his wife to Samuel Dressor be reformed to truly describe the premises mutually intended to have been conveyed. The relief sought by the second counterclaim was a decree adjudging that the Bond County Oil Company had forfeited its lease by reason of its failure to pay rentals from the time the well ceased to produce, and that McClure or her assignee, the Bond County Oil Company, be ordered to release it of record. The third counterclaim alleged that, on November 1, 1941, Sherman S. Dressor, Samuel J. Dresser, Emanuel J. Coyle and their respective wives leased the premises for oil and gas to John L. Neary, and that, on January 22, 1942, Neary and his wife assigned to J. O. Davis a portion of the lease; that, on February 7, 1942, Neary and his wife assigned the remaining portion of the oil and gas lease to J. W. Reynolds; that Reynolds commenced drilling a well but abandoned drilling operations and removed his equipment from the premises when he reached a depth of 350 feet, and that his lease thereby became forfeited and terminated. The relief sought by the third counterclaim was a decree declaring that the rights of Neary, Reynolds and Davis under the lease and the assignments had been forfeited and terminated. On December 16, 1943, plaintiff, pursuant to leave granted, filed an additional count in equity charging that all mineral deeds, oil leases and assignments thereof were null and void because Samuel J. Dressor had no interest in the real property which he could sell and

convey. For the first time in the course of this litigation, plaintiff asked that the deed from himself to Dressor in 1924 be declared a mortgage and not a title or conveyance in fee; that Samuel J. Dressor be declared a mortgagee; that an accounting be taken of the amount due and owing from plaintiff to Dressor, his son, and their wives; that plaintiff be allowed to retain the premises upon payment by him of the amount found due the Dressors which he offered and tendered to them, and that they be commanded to surrender the premises to plaintiff by proper deeds of conveyance. Plaintiff answered the first counterclaim, denying its material allegations and himself asking that the deed be declared a mortgage, and that the Dressors be adjudged mortgagees in possession. Frank DeMayo and his wife, H. McClure, the Bond County Oil Company and Grosscurth answered the original complaint and the additional count in equity, concluding with a prayer that the court direct the sum of $857.64 due from the Pana Refining Company for oil produced from the well be declared owing to the Bond County Oil Company; that the decree adjudge the oil well to be situated upon real estate over which the Bond County Oil Company is the sole and exclusive owner; that the machinery and equipment thereon is its property, and that it enjoys the right and power, at its own expense, to remove the same, or any part thereof. J. O. Davis, by his answer, sought maintenance of his right to drill and produce oil under his leasehold estate. The principal defendants, the Dressors and eight others, answered the additional count in equity and, by way of affirmative defense, averred that Samuel J. Dressor and his successors in interest had been in open, notorious, adverse, uninterrupted and peaceful possession of all the property, including the four-by-nine-rod tract, for eighteen years or more and until the commencement of this action; that they had farmed the land and exercised complete control over it, as previously described, without protest or

claim of any nature by plaintiff; that Dressor sold and conveyed a part of the mineral rights and executed an oil and gas lease covering all of the lands during the term of which an oil well was drilled on the property, with plaintiff's knowledge and without objection or claim of any interest thereto by him, and that, consequently, plaintiff, during this time, had no interest in the lands, or any part thereof, including the four-by-nine-rod tract, but, instead, a duty rested upon him to proclaim his interest with reasonable diligence and, having failed so to do for upwards of eighteen years, he was now barred in equity from asserting his claim.

The cause was referred to a special master in chancery. After hearing testimony over a period of approximately four months, he made his report of findings and conclusions of law and fact. The report was adverse to plaintiff on all issues presented for decision, in favor of Samuel J. Dressor and his son, Sherman, on all material issues, with the exception of the finding that the oil and gas lease made by Samuel J. Dressor to McClure and, in turn, assigned by her to the Bond County Oil Company was still in force and effect, subject to the mineral deed from Dressor to Coyle, granting him one half interest in the oil and gas rights and that the Bond County Oil Company and Coyle were each entitled to one-half of seven-eighths of the oil produced from the well on the four-by-nine-rod tract, the other one-eighth being owned equally by Dressor and Coyle. Plaintiff filed objections to the report and Samuel J. and Sherman Dressor, and seven others, filed an objection to the portion of the report finding the oil and gas lease from Dressor to McClure still in force, submitting that it was abandoned by McClure and the lessee, Bond County Oil Company, and that, by reason of the abandonment, all rights of the lessee and her assignee were lost and forfeited, conformably to the terms of the lease. All objections were overruled and ordered to stand as exceptions.

The court overruled plaintiff's exceptions to the master's report and allowed the exceptions interposed by the Dressors and their codefendants.

On May 31, 1946, a decree was entered finding that the warranty deed of July 9, 1924, conveyed the property according to its tenor, and, conversely, was not a mortgage either in law or in equity; that, by reason of the inaccurate and erroneous description on the part of the scrivener, the tract nine rods long and four rods wide, an integral part of the land plaintiff intended to convey, was unintentionally omitted from the conveyance, and that therefore the deed should be reformed; that Emanuel J. Coyle, not being a party to the lease from Samuel J. Dressor and his wife to McClure, nor in the assignment of the lease from McClure to the Bond County Oil Company, is the owner of an undivided one-half of the minerals underlying the premises on which the well was drilled and from which the oil produced was obtained and sold, and that he was therefore entitled, as owner of the minerals, to one-half of seven-eighths of the production, as well as one-half of one-eighth of the production; that the Bond County Oil Company, acting through Frank DeMayo, ceased to operate the well on and after November 1, 1940, and had caused the engine to be removed from the pumping unit of the well, had never returned it, and that, by reason thereof, the Bond County Oil Company had abandoned the well, thereby losing all interest which it had in and to the lease obtained by assignment from McClure; that, by reason of the abandonment of the well by the oil company, it, and all other defendants claiming an interest in and to the well through the lease executed by Dressor to McClure, had lost and forfeited all right to enter on the premises for the purpose of operating the well or removing equipment remaining on the property; that such equipment as remained on the property had become the property of Samuel J. Dressor and his grantees and, further, that by discon-

tinuing drilling operations and causing the drilling rig and equipment to be removed from the premises, Reynolds entirely abandoned the lease from Neary, and that, by reason of such action, the lease had been forfeited and abandoned by Neary, Reynolds and Davis. The chancellor ordered that plaintiff's complaint, as amended, be dismissed for the want of equity; adjudged that the deed from Spies and his wife to Samuel J. Dressor was not, either in law or in equity, a mortgage but was, instead, a deed intended by the parties to convey fee-simple title to all the land owned by Spies to Dressor; directed plaintiff to execute a good and sufficient deed conveying the land by its correct description to Dressor and his successors in title and that, upon his failure so to do, the master in chancery execute such deed; that the Bond Oil Company, assignee of H. McClure, release of record the oil and gas lease executed by Samuel J. Dressor and his wife to McClure, dated August 19, 1939; that J. O. Davis and J. W. Reynolds, assignees of John L. Neary, release of record the oil and gas lease executed by Dressor and his wife to Neary, dated November 1, 1941; that the Pana Refining Company distribute and pay out of the funds in its hands in the amount of $857.64 for oil sold to it by the Bond Oil Company, as follows: to S. J. Dressor, $53.61; to Emanuel J. Coyle, $53.61; Bond Oil Company, $375.21 and Emanuel J. Coyle $375.21, and that the Bond Oil Company pay to Coyle, $118.12, being one-half of seven-eighths of the oil sold by it to Allied Pipe Line Corporation, and now in its hands, as trustee, for Coyle. Plaintiff filed his notice of appeal and Frank DeMayo and his wife, H. McClure, the Bond Oil Company and C. Grosscurth joined in the appeal.

The principal question presented, namely, whether the deed from plaintiff to Samuel J. Dressor was a mortgage or, instead, a good conveyance of title does not involve a freehold (*Swinson* v. *Sodaman,* 369 Ill. 442,) but the question whether this deed should be reformed to include the

small tract of four by nine rods does necessarily involve a freehold. When this action was brought, title to this small tract was vested in plaintiff. The decree divested him of his title and placed it in his grantee and the latter's successors in interest. We must determine whether this portion of the decree was correct, and our decision, as did the decree of the circuit court, necessarily involves a freehold.

A procedural question requires initial consideration. By stipulation, the parties agreed that the original transcript of the evidence as taken by the master, including all exhibits offered in evidence, and filed with the clerk of the circuit court, might be included in the transcript and filed in this court. The original transcript of testimony and exhibits, and the original of the master's report have been incorporated in the record on appeal without any certification by the trial judge. Samuel J. Dressor and ten other defendants have made a motion to strike the original instruments mentioned from the record and to dismiss the appeal. The motion has been taken with the case.

Reliance is placed upon the portion of Rule 36(1)(b) which provides that the original copy of the proceedings at the trial, as certified by the trial judge, or the original of the master's report may be incorporated in the record on appeal by order of the court or by stipulation of the parties. The contention is made that the originals of the report of the testimony taken before the master and the master's report should have been certified by the trial court. To a like contention in *Central Illinois Public Service Co. v. Swartz*, 284 Ill. 108, this court answered: "The decree shows that the hearing was upon the pleadings and the report by the master of the evidence and of his findings of fact and conclusions of law and the exceptions of the appellees. Therefore no certificate of evidence was necessary. When a cause is referred to a master in chancery to report conclusions of law and fact all the evidence must

be introduced before him, and upon the hearing of exceptions to his report or the hearing of the cause no other evidence will be heard. The report of the master is a part of the record without any certificate of evidence." The report of the master, upon filing, being a part of the record in the cause when, by order of the court or by stipulation of the parties, as here, the original master's report is incorporated in the record on appeal, it becomes unnecessary to have a report of proceedings at the trial in order that such original master's report may be certified by the trial judge. As pointedly stated in *Amberg* v. *Meeker*, 290 Ill. App. 147, "To hold otherwise would be to require the court to certify into the record on appeal that which is already a part of the record in the case." See: McCaskill, Illinois Civil Practice Act Annotated, 1936 ed., p. 259.

Another reason for denying the motion to dismiss is that it is not supported by affidavit, as prescribed by Rule 36(4), showing, not only that the matter complained of is not properly authenticated, but that it is in fact incorrect, and that injury will result to the objecting party because of its inclusion. Rule 36(4) ordains: "Unless a motion is made in the manner required by this rule, the record shall be deemed to be correct."

The motion to dismiss the appeal is denied.

Plaintiff devotes the greater part of his brief and argument to the contention that the deed executed by him was intended as security and is, in reality, a mortgage, despite its form as a warranty deed. The issue made by the pleadings and decided adversely to plaintiff by the master in chancery and the chancellor has been briefed exhaustively, even to the point of invoking the seventh verse of chapter 22 of Proverbs. Recourse to the evidence discloses beyond any reasonable doubt that the intention of the parties and, particularly, the intent of plaintiff himself was to convey the farm property which he owned in 1924 to

Samuel J. Dressor. Our attention has been directed to several statements, isolated from their context, which, standing alone, might lend some frail support to plaintiff's claim. A consideration of all the facts demonstrates, however, plaintiff's intent to convey the land in question to Dressor in fee simple. The law is firmly established that, in order to declare a deed, absolute in form, a mortgage, the evidence must show it was intended as a security in the nature of a mortgage to cover a continuing valid indebtedness enforceable by the grantee in an action at law or by foreclosure proceedings. (*Robnett* v. *Miller*, 303 Ill. 515; *Kimmel* v. *Bundy*, 302 Ill. 514; *Illman* v. *Kruse*, 301 Ill. 408; *Kelly* v. *Lehmann*, 297 Ill. 33; *Friend* v. *Beach*, 276 Ill. 397; *Caraway* v. *Sly*, 222 Ill. 203.) The deed itself must be considered as determining the rights of the parties unless some equity is shown to the contrary. *Robnett* v. *Miller*, 303 Ill. 515; *Kelly* v. *Lehmann*, 297 Ill. 33.

The evidence adduced by plaintiff is far from clear and convincing. There was no debt owing by plaintiff to Dressor to be secured when the deed was executed. Referring to the chattel mortgage note of $2300, it is manifest that both plaintiff and Dressor intended the actual debt evidenced by the chattel mortgage note to be secured solely by the chattel mortgage, and that such amount as might be realized from a sale of the mortgaged property would terminate plaintiff's liability thereunder. The actions of the parties contemporaneously with and subsequent to the chattel mortgage sale fortify this conclusion. It cannot be said that the deed was executed to secure the substantial amounts, approximately $7000, paid by Dressor to the Bradford National Bank, Merry and the land bank to apply on plaintiff's debts. There is not a scintilla of evidence indicating when, if ever, plaintiff was to pay the debt he now asserts the deed was made to secure. Similarly, the record is barren of any reference to the rate of interest to be paid on the alleged debt to Dressor. A more rea-

sonable conclusion from the facts and circumstances is that plaintiff deeded the farm to Dressor "For backing him up" as Sherman Dressor put it and, as plaintiff himself testified, "to help to stand good for all my notes" and Dressor agreed "to back me on all my accounts." The conclusion is impelling that the theory of the deed being in substance a mortgage is a long-delayed afterthought, belated even beyond the point of oil being produced from the four-by-nine-rod tract.

Apart from the observations made, we are of the opinion that plaintiff is barred by *laches* from asserting any claim of equity in this action. As so pertinently observed in *McDearmon* v. *Burnham,* 158 Ill. 55, referring to delay covering a period of fourteen years, "When a court of equity is asked to lend its aid in the enforcement of a demand that has become stale, there must be some cogent and weighty reasons presented why it has been permitted to become so. Good faith, conscience and reasonable diligence of the party seeking its relief are the elements that call a court of equity into activity. In the absence of these elements the court remains passive, and declines to extend its relief or aid. It has always been the policy to discountenance *laches* and neglect." Death has silenced many of the active participants in the transactions leading to the execution of the deed in 1924 as part and parcel of a plan of financial salvation for plaintiff. His contention that the deed was a mortgage, finding substantial support only in his own testimony, is utterly devoid of merit.

It follows almost necessarily that the deed should be reformed to include the four-by-nine-rod tract. In order to justify the reformation of a deed upon the ground of mistake, the mistake must be of fact and not of law, mutual and common to both parties, and in existence at the time of the execution of the instrument, showing that at such time the parties intended to say a certain thing but mistakenly expressed another. (*Ambarann Corp.* v. *Old Ben*

*Coal Corp.* 395 Ill. 154; *Gromer* v. *Molby,* 385 Ill. 283.) The location of a division line between adjoining premises is a question of fact. Trees and the remains of old fencing mark the boundaries of the strip and have been recognized by the adjacent property owner for more than forty years. A well-established fence line or fence row stood between the land owned by plaintiff or Dressor and the property owned by the Wades. The adoption of a division line between the owners of adjoining lands may be implied from their acts and declarations and by acquiescence in respect thereto. (*Kandlik* v. *Hudek,* 365 Ill. 292.) The correct legal description of the farm by metes and bounds discloses an extraordinarily detailed description. The four-by-nine-rod tract was a contiguous part of the farm. Plaintiff testified that it was a part of the farm when he owned it; that it is not set off by itself; that he occupied it as an integral part of the farm, and that no one else asserted a claim of ownership to any part of it prior to July 9, 1924. When the negotiations for conveyance of the farm to Dressor were in progress, no one made any reference whatever to a possible reservation of this small strip. Plaintiff testified, when asked if he thought the deed included the four-by-nine-rod tract, "Nothing was said about it." To the further inquiry as to whether he ever "from that time until this litigation started" made any claim to the four-by-nine-rod tract, plaintiff answered, "No, I am sorry I did not." The evidence admits of no conclusion in this respect other than that plaintiff believed he had deeded the entire farm, including the small tract, to Dressor. Most assuredly, Dressor was of the opinion that it had been conveyed to him when he proceeded to sell oil and gas rights from time to time, to lease the property for oil and, in general, to exercise the same rights of ownership relative to the four-by-nine-rod portion of the land as he did concerning the rest of the farm. The error in description was not discovered until Sherman S. Dressor bought the farm from

his father and was in the process of making financial arrangements necessary to consummate·the purchase. To correct the deed, he took a quitclaim deed to plaintiff who refused to sign it, not because of any claim then made that the strip actually belonged to himself, but for the reason that his nephew, Sherman Dressor, declined to become surety on a note for $300 for him. A clearcut case of mutual mistake is presented by the evidence. DeMayo's contention that the portion of the land on which the oil well is located was on property belonging to Albert Wade merits but passing mention. A sufficient answer is that neither Wade nor his heirs make such contention. The mutual intention of the grantors and the grantee is abundantly clear, the evidence leaving no reasonable doubt as to the mutual intention of the parties, and was properly effectuated by the decree directing a reformation of the deed dated July 9, 1924.

The final contention requiring consideration is whether the portion of the decree finding that the Bond County Oil Company, through Frank DeMayo, abandoned the oil well, thereby losing all interest it had in and to the oil and gas lease which H. McClure had previously obtained from Samuel J. Dressor. Included in this general contention is the subordinate issue as to whether the abandonment by the oil company resulted in it and all other defendants claiming an interest in and to the oil well forfeiting their right to enter upon the property for the purpose of operating the well, or removing the equipment or personal property remaining. An oil and gas lease may be abandoned by cessation of operations for an unreasonable length of time. This being so, fixtures abandoned with an oil and gas lease become the lessor's property. The question with respect to the abandonment of the oil and gas lease under which the Bond County Oil Company conducted its drilling operations is essentially one of fact. Operations had terminated a considerable period of time before plaintiff filed

his complaint. The inescapable fact that the last oil produced was shipped on March 27, 1940, protrudes itself. Plaintiff made no claim to the oil prior to filing his complaint on June 10, 1942. We deem it sufficient to say that the circuit court correctly decided that Dressor, Coyle and the Bond County Oil Company were entitled to all the proceeds from the well on the four-by-nine-rod tract in the amounts previously set forth. Perhaps the controlling fact appears in Frank DeMayo's answer to the question whether the condition of the title was the reason he ceased operations: "Well that and, well the whole thing. It just got disgusting that's all." DeMayo testified that he had visited the neighborhood where the well was located only three times during the years it had been idle. There was abandonment in fact as well as in law. Upon abandonment of drilling operations and forfeiture of an oil-and-gas lease, as here, the privilege of removing the equipment, if any, is limited to a reasonable time. The only equipment remaining on the land, according to the evidence, is such equipment as is used in connection with the well itself. Obviously, the removal of such equipment from the well would render it valueless. Cessation of operations for a considerable period of time, if unexplained, may be sufficient to warrant a declaration as a matter of law that an oil lease has been abandoned. (*Powers* v. *Bridgeport Oil Co.* 238 Ill. 397; *Michaels* v. *Pontius,* 83 Ind. App. 66.) Equipment abandoned with an oil lease becomes the lessor's property. As said in *Michaels* v. *Pontius,* 83 Ind. App. 66, the lessee, in abandoning its lease and failing to remove its property within a reasonable time thereafter, thereby abandoned such property, and it "became the property of the owner of the land which had been covered by the lease, and on which it was located."

The decree of the circuit court of Bond county is right, and it is affirmed.

*Decree affirmed.*