PATRICIA BELDEN, Ex'r of the Estate of W. L. Belden, Deceased, Plaintiff-Appellant, *v.* TRI-STAR PRODUCING CO., INC., *et al.*, Defendants-Appellees.

Fifth District    No. 81-578

Opinion filed May 12, 1982.

Martin J. Corbell, of Vandalia (Corbell and Miller, of counsel), for appellant.

Robert M. Crain, of Crain, Hall and Cooksey, Ltd., of Centralia, for appellees.

JUSTICE WELCH delivered the opinion of the court:

At issue in this appeal are the rights under certain oil and gas leases covering 40 acres of Fayette County land. This land was and is owned by several individuals collectively referred to as the "Breeze heirs" and thus the tract is known as the "Breeze lease" or the "Breeze land." The precise question presented is whether a 1938 oil and gas lease covering that land expired under the terms of the habendum clause in that lease.

On July 18, 1938, the then owners of the Breeze land entered into an oil and gas lease with the Minerva Oil Company as lessee. The lessors reserved unto themselves the then customary one-eighth royalty, which would become three-sixteenths in the event that production exceeded a specified level. The lease was to remain in effect for one year "and as long thereafter as oil or gas or either of them is produced from said land by lessee." No mention was made in the lease of the possibility of pooling or unitization or of the rights of the parties should either occur.

Wells were drilled and oil was produced on the Breeze land, but by the early 1950's it became apparent that a secondary recovery program would be required to extract the maximum amount of oil. To that effect, Minerva joined with Shell Oil Company and Austin Stewart, the operators of adjacent oil leases, and a waterflooding secondary recovery program was decided upon in an agreement dated September 15, 1954. It was contemplated that all lessors in the proposed North Louden Flood Unit, which would include the Breeze land, would agree to unitize their interests and be paid royalties out of the total production of oil from the Unit.

In 1956, Shell petitioned the Illinois Department of Mines and Minerals for approval of the North Louden Flood Unit and the proposed waterflooding to take place in the Unit. In the petition, Shell recognized that certain royalty owners, including all the Breeze heirs, had not consented to unitize their interests, but it was promised that the flooding operations would be conducted in such a way as to protect the rights of these royalty owners. A hearing on Shell's petition was held in Springfield on April 18, 1956. Two of the Breeze heirs appeared on behalf of themselves and the other Breeze owners. Both Francis Breeze and Hattie Breeze expressed no objection to Shell's secondary recovery program, but neither wished to share in the total production from the Unit. Instead, they insisted upon receiving royalties only from the oil production on the Breeze land.

The Department of Mines and Minerals approved Shell's plan on May 3, 1956. None of the Breeze owners signed a unitization agreement, and thus during the secondary recovery operations oil from the Breeze lease was stored in a separate tank on the Breeze land, and royalties were paid to the Breeze heirs only from the sale of oil from this separate tank. The record does not indicate whether oil production from the Breeze lease was continuous during Shell's direction of the secondary recovery operations, but oil was obtained from that land during 1966. In July of that year, Shell transferred its working interests in the North Louden Unit to R. H. Troop. Troop wrote to the royalty owners in the Unit and requested that they sign division orders which would allocate royalties according to the percentages established in the unitization agreement reached ten years earlier. Again, none of the Breeze owners consented to unitize their royalty interests.

Troop began to operate the Breeze lease in 1966, although Minerva Oil Company did not assign its interests in the 1938 lease to him until March of 1967. Claude Moore, Troop's production superintendent, recalled in an evidentiary deposition taken in 1977 that when Troop commenced work on the Breeze land in 1966, there were three production wells located on the land, as well as several water injection wells. Of these three producing wells, only one was in a functioning capacity, another well was missing a pumping unit and the third consisted only of the casing

in the hole. The single producing well yielded about a half barrel of oil each day, but 75 or 80 barrels of water were produced along with each half barrel of oil. According to Moore, it took until October of 1967 for Troop to extract a single tank of oil from the Breeze land, and, that month, the oil was sold to the Sohio Petroleum Company. Out of the proceeds of that sale, Troop tendered royalty checks to each of the current Breeze royalty owners. Four of these checks were for $14.60 and four were for $3.65. One check in each amount was accepted by certain of the Breeze heirs but the rest were refused.

Troop continued to recover oil from the Breeze tract until approximately 1968, when the producing well equipment was struck by lightning. After the October 1967 sale of oil, less than a tank of oil was obtained from the Breeze land, and, according to Moore, this oil remained unsold when he left Troop's employ in April of 1974. Moore remembered that, although work was done on the Breeze lease after 1968, no oil was produced from it between that year and 1974.

In 1970, W. L. Belden, an independent oil producer and the original plaintiff in this case, was contacted by several of the Breeze heirs about their lease. They informed him that there had been no oil production from their property for two or three years, and, upon personal inspection, Belden discovered that the lease was indeed idle. He continued to watch the land for two or three more years and noticed no further activity. The Breeze heirs again contacted Belden in 1974 or 1975, and he returned to the Breeze land once more, only to find it still without oil production. He then prepared an oil and gas lease of the property with himself as lessee, which was signed by all the Breeze heirs between April 23, 1975, and July 7, 1975. It was recorded in Fayette County on July 21, 1975. Since the 1938 oil and gas lease executed by the Breeze family had not been released, the 1975 lease to Belden is referred to as a "top lease."

Meanwhile, R. H. Troop died on May 15, 1975. In February of that year, Troop had sold all of the equipment and wells comprising the North Louden Unit to John Homeier. Tri-Star Producing Company, a defendant, succeeded to the operation of the Unit effective March 1, 1975. Richard Koons, who served as vice-president of Tri-Star until January 1976, testified that no oil was being produced on the Breeze lease when Tri-Star took over the Unit and its operations. He did not know when the last oil had been obtained from the land prior to March 1975.

Tri-Star's time records, as identified by Mary Youther, a Tri-Star bookkeeper, show that Tri-Star men and equipment were initially used in an attempt to restore production on the Breeze lease on May 22, 1975. The first bill from an independent oilfield contractor to Tri-Star concerning work specified to have been on the Breeze lease is dated April 22, 1975. It would serve no purpose to summarize the voluminous evidence pertain-

ing to the work performed to restore production on the Breeze land after these dates. Suffice it to say that personnel from Tri-Star or from independent contractors hired by Tri-Star were frequently on the production equipment on that land up to the September 1979 trial date.

According to Richard Koons, oil commenced to again be extracted from the Breeze land by Tri-Star on approximately October 1, 1975. Lon Rogers, who was employed as a pumper for Tri-Star, also recalled that oil was produced on the Breeze lease some time in the fall of that year. Ralph Wright, who worked as a gauger for the oil purchaser, Sohio Pipeline Company, was assigned to gauge the oil output on the North Louden Unit beginning in 1973. He stated that he first gauged oil from the tank on the Breeze lease in 1976. A tabular summary of production on that lease between March 1975 and June 1979 introduced into evidence by stipulation corroborates Wright's testimony. It indicates that no oil was produced from the Breeze land until May 1976, even though oil production was largely continuous after that date.

Before the top lease was granted to Belden, an affidavit was executed by several of the current Breeze heirs in which they stated that no oil or gas had been produced on their property for 36 months before March 17, 1971. This document was recorded on March 14, 1974. After he obtained the top lease, Belden wrote to Richard Koons at Tri-Star. In a letter dated August 26, 1975, Belden informed Koons of the top lease and noted that he had obtained affidavits of nonproduction on the Breeze tract. He wrote:

> "We are aware that you have been doing some work on this tract and understand from the original oil and gas lease, in favor of Minerva Oil Company, that equipment may be removed from this tract. We are assuming that this is the work that you may be doing. We trust you will complete this work in such a manner as not to damage any sands in the productive areas in the formations, as we plan to develop and complete productive wells in the very near future."

Koons replied to Belden by letter dated September 3, 1975. He stated that Tri-Star had acquired Troop's interests in the Breeze land and that Tri-Star intended "to do the necessary work required of these interests and operate these interests in accordance with its rights."

On September 30, 1975, Belden filed his complaint in the present case. He alleged that the lease upon which Tri-Star's claims were based had expired by its own terms, by reason of cessation of production, and in support of this allegation, an affidavit from Claude Moore was attached to the complaint. That affidavit, which had been recorded on August 29, 1975, proclaimed that no oil was produced from the Breeze land between March 1, 1970, and September 1, 1973. The complaint also alleged that Tri-Star was wrongfully interfering with Belden's use of the Breeze land

and had not removed its equipment from the property. Belden requested that the original Minerva lease be declared to have expired by its own terms. He also sought an injunction to prevent Tri-Star from interfering with his operation under his 1975 lease and to require Tri-Star to remove its personal property from the leasehold and to plug the existing wells.

Belden filed an amendment to his complaint on June 17, 1976. In count II, he claimed that Tri-Star had begun extracting oil from the Breeze land on May 5, 1976, and he sought an injunction preventing further removal of that oil. Count III re-alleged the facts pleaded in count II and requested punitive damages for the actions taken by Tri-Star.

The case proceeded to a bench trial in September 1979. Various parties were added and dismissed before that time in order to ensure proper representation of all interests in the Breeze land and leases. Patricia Belden, as the executrix of the estate of W. L. Belden, deceased, was substituted as the plaintiff. Following the presentation of evidence, including that discussed above, Tri-Star tendered to the clerk of the court a check in the amount of $12,229.03, which represented the royalty said to be due the Breeze heirs for oil production on their land through June 1979.

In its judgment of October 30, 1981, the trial court found that the 1938 Minerva lease was still in effect, that the North Louden Flood Unit was a valid water flood unit, and encompassed the Breeze lease, and that Belden had knowledge of the continuing production activities on the Unit. It was also stated that the 1938 lease had not been abandoned and that "it would be inequitable for plaintiff to prevail." Judgment was entered in favor of the defendants on count I of the complaint, and in view of this disposition, the trial court concluded that counts II and III could not be maintained, and therefore ordered that they be dismissed.

An appeal from that judgment has been perfected by the plaintiff. In this court, it is argued that the 1938 Minerva lease expired under its habendum clause by virtue of the nonproduction from the Breeze land. It is claimed that the trial court erred in basing its decision on the existence of the North Louden Unit and on production from the Unit, because the Breeze heirs never agreed to unitize their royalty interests with those from the rest of the Unit.

The defendants respond that the plaintiff's original complaint was insufficient to state a cause of action and that the suit cannot be maintained in that it is a collateral attack on the 1956 order of the Department of Mines and Minerals which created the North Louden Unit. They also reply that the evidence shows that the Breeze lease was not abandoned, that Belden's knowledge of Tri-Star's activity on the Breeze land prevents the plaintiff from asserting any claim in derogation of Tri-Star's interests, and that the Breeze heirs are estopped from defeating Tri-Star's lease

because they did not object to the unitization agreement or to Tri-Star's work on the Breeze land.

In discussing the sufficiency of the plaintiff's complaint, both parties have limited their arguments to count I. Thus, the propriety of counts II and III is not before us. (73 Ill. 2d R. 341(e)(7).) Defendants' objections to count I fall into two categories. First, they state that the complaint did not show that the plaintiff was entitled to a declaration that the 1938 lease was invalid because the plaintiff did not allege that the Breeze heirs who signed the 1975 lease owned the land in question or that Belden, rather than Tri-Star, was in possession of that land when the complaint was filed. They also deny the sufficiency of the plaintiff's request for an injunction and point to the conclusory nature of the allegations of irreparable harm, the failure of the plaintiff to show the inadequacy of money damages, and the absence of a description of the way in which Tri-Star was said to have interfered with Belden's activities on the land, if any such activities were in fact undertaken by Belden.

■■ The fact that the objections to count I of the complaint may be placed in two categories according to the various types of relief requested indicates a defect with that complaint. The desired declaratory judgment would be based upon the nonproduction from the Breeze lease, while the requested injunction would of necessity follow only from the allegation that Tri-Star was interfering with the use of the land. As such, count I presents two separate causes of action, in violation of section 33(2) of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 33(2)). However, the defendants have not raised this defect in the trial court or in this court and it is waived. *Sunbeam Corp. v. Central Housekeeping Mart, Inc.* (1953), 2 Ill. App. 2d 543, 120 N.E.2d 362; *Zachotina v. Town of Cicero* (1941), 312 Ill. App. 178, 37 N.E.2d 893 (abstract).

■■ In order to state a cause of action to declare an oil and gas lease terminated because of nonproduction under its habendum clause, a plaintiff must allege his interest in the leasehold and must state that there has been no production on that land for a sufficient period of time to negate the inference that the cessation of production was only temporary. (*Gillespie v. Wagoner* (1963), 28 Ill. 2d 217, 190 N.E.2d 765; 2 W. Summers, The Law of Oil and Gas sec. 305 (rev. ed. 1959).) The specific allegations of the plaintiff's original and amended count I were that the plaintiff was the "owner" of the 1975 lease from the Breeze heirs and that the 1938 Minerva lease, under which Tri-Star claimed its rights, had expired by its own terms due to nonproduction on the land. A copy of the 1975 lease, the 1938 lease and Claude Moore's affidavit of nonproduction were attached to the complaint and incorporated therein by reference.

The defendants urge that since the plaintiff did not claim that the

lessors in the 1975 lease owned the Breeze land or deny that Tri-Star was in possession of the property, the complaint is insufficient under the authority of *Ragsdale v. Superior Oil Co.* (1968), 40 Ill. 2d 68, 237 N.E.2d 492. In that case, the plaintiff, Samuel Ragsdale, was the owner of certain Jefferson County land which was conveyed by sheriff's deed to Robert Ragsdale, who, in turn, conveyed the surface estate to Myrle Marlow while reserving one-half of the mineral rights. Robert Ragsdale and Marlow executed an oil and gas lease which was ultimately assigned to Superior Oil Company. The plaintiff filed a complaint which alleged that he was the fee simple owner of the land in question and that Superior had wrongfully entered the premises and extracted a substantial quantity of oil. Damages were requested in the amount of $500,000.

The Illinois Supreme Court affirmed the trial court in granting judgment for the defendants on the pleadings. It was stated:

> "As presented, this action is in the nature of trespass. But, an action in trespass for damages to the freehold or for severance or conversion of part of the freehold cannot be maintained by the alleged owner while another is in possession claiming adversely. [Citations.] Before maintaining trespass plaintiff would have to recover possession through an ejectment action. In such a case he would have to recover on the strength of his own title, not on the weakness of that of his adversary." 40 Ill. 2d 68, 71-72, 237 N.E.2d 492, 495.

The complaint in *Ragsdale* was defective precisely because the plaintiff did not allege the superiority of his own title or right to possession. Both allegations are essential in a trespass action (*Krejci v. Capriotti* (1973), 16 Ill. App. 3d 245, 305 N.E.2d 667), and, the defendants correctly argue, those allegations are also necessary to a suit to quiet title (*Barger v. Slayden* (1952), 411 Ill. 237, 103 N.E.2d 645). But, we can find no authority to justify applying these strict pleading requirements to an action to declare a prior oil and gas lease void.

■■ Indeed, the purpose behind actions to have an oil and gas lease declared terminated, such as this action, as well as suits to cancel these leases, is to promote development of the land for oil and gas so that the owner may receive royalties. (3 W. Summers, The Law of Oil and Gas sec. 453 (rev. ed. 1958).) We do not believe that this policy would be well served were we to require that a plaintiff in this type of action plead and prove either that the land is vacant or is occupied by him, as he must show in a trespass or quiet title suit. The significant question is whether production is being had from the land (*Gillespie v. Wagoner*), and an allegation of the state of possession is completely irrelevant to the resolution of that question.

Moreover, *Ragsdale* provides no guidance in this case, because *Rags-*

*dale* involved a suit between one who alleged himself to be the owner of the mineral interests in the land and an owner of an oil and gas lease obtained from a third party. The present case is a contest between rival owners of two oil and gas leases which were, in effect, obtained from the same party. Unlike *Ragsdale*, there is no dispute as to who owns the underlying mineral interests out of which the oil and gas leases were created.

Nor do we find plaintiff's allegations of the source of his interests insufficient to support a request for a declaratory judgment. Count I referred to the plaintiff as the "owner" of a lease which "grants plaintiff the right to mine and operate for oil and gas on the premises described in said lease." While it would perhaps have been preferable for the plaintiff to state specifically that the lessors in that lease were the owners of the Breeze property, the attachment to the complaint of the duly recorded 1975 lease provides sufficient detail to inform the defendants of the manner in which the plaintiff purported to derive his interest in the Breeze property, given that the lease was properly part of the complaint. (Ill. Rev. Stat. 1979, ch. 110, par. 36.) Where, as here, it is the lessee who brings suit to declare the earlier lease terminated, there is certainly nothing to be gained by requiring an allegation of the lessors' ownership.

Those parts of count I which allege facts pertaining to the declaratory judgment action, while somewhat skeletal, do state a cause of action. The trial court was thus correct in not dismissing this portion of the complaint. The same cannot be said of the request for an injunction contained in count I.

As pertains to the request for injunctive relief, the amended version of count I stated that defendant Tri-Star "has wrongfully interfered with plaintiff's use of the said premises and has located equipment and machines upon the said premises all to the detriment of plaintiff" and "has refused to desist from interfering and refuses to remove defendant's machines and equipment from said premises." It was also alleged that Tri-Star "is responsible for the plugging of existing wells on the said lease but has failed and refused to plug the said wells." The plaintiff noted that "the damage complained of is constant and continuous and unless abated the plaintiff will suffer irrepairable [*sic*] injury for which there is no adequate remedy at law." The original version of count I requested that Tri-Star and its personnel be restrained from interfering with the plaintiff's operations, and that Tri-Star remove its personal property from the leasehold and plug existing wells.

As mentioned previously, the defendants characterize this part of count I as conclusory. More particularly, it is argued that the complaint does not specify how Tri-Star was interfering with the plaintiff or what activities of the plaintiff were being obstructed. Additionally, the defend-

ants note that the plaintiff has failed to allege facts to support the assertion that money damages would be inadequate or that irreparable injury would result were the injunction to be denied.

■■ Because an injunction is an extraordinary remedy, the complaint must allege facts which entitle the plaintiff to the remedy, and cannot present mere conclusions unsubstantiated by facts. (*Betts v. Department of Revenue* (1979), 78 Ill. App. 3d 102, 396 N.E.2d 1150.) This maxim applies to all facets of the complaint, including the claims that a legal remedy would be inadequate (*Betts; Larkin v. Howlett* (1974), 19 Ill. App. 3d 343, 311 N.E.2d 367) and that irreparable injury would occur in the absence of an injunction (*Larkin; Parsons v. Walker* (1975), 28 Ill. App. 3d 517, 328 N.E.2d 920). Even a cursory examination of count I reveals that it is deficient in the allegation of facts which could support either claim.

■■ By not describing in any detail the purported interference by Tri-Star, count I leaves the reader to guess not only what activities (beyond the location of equipment on the premises) should be enjoined, but also why money damages would be inappropriate, and what injury would occur without the injunction. For this reason, we agree with the defendants that count I cannot support any injunctive relief, and although the plaintiff in that count has stated a cause of action for a declaratory judgment, no cause of action has been pleaded to the extent that an injunction has been requested. The trial court thus correctly denied the injunction as sought in count I. Pursuant to our authority under Supreme Court Rule 366(a) (73 Ill. 2d R. 366(a)), we will henceforth treat the request for injunctive relief as stricken from count I.

The defendants argue that, even if the remainder of count I states a cause of action, the present suit may not be maintained inasmuch as it is a collateral attack on the 1956 order of the Illinois Department of Mines and Minerals which established the North Louden Unit. This contention is based on a misapprehension of the scope of that order. The 1956 decision did give administrative approval to the operation of the leases in the North Louden area as a waterflooding project, but the plaintiff does not, by his complaint, purport to challenge that approval. Instead, the plaintiff seeks to assert rights under the leases to the Breeze property, and, as noted earlier, nothing in the 1956 order acted either to nullify, modify or confirm the 1938 Minerva lease. The plaintiff's arguments are thus directed not to the 1956 order, but to the separate 1938 lease, and this suit is not a collateral attack upon any action taken by the Department of Mines and Minerals.

Finally, we come to the merits of this dispute which, simply stated, are whether the 1938 Minerva lease expired under its own habendum clause due to nonproduction on the Breeze land between 1968 and 1975.

In order to clarify this discussion, it would be well to mention the issues that are not presented by this case.

First, the plaintiff never argued that this 1938 lease was abandoned. Abandonment, which has been discussed in several Illinois cases (*Shannon v. Stookey* (1978), 59 Ill. App. 3d 573, 375 N.E.2d 881; *Spies v. DeMayo* (1947), 396 Ill. 255, 72 N.E.2d 316; *Gillespie v. Ohio Oil Co.* (1913), 260 Ill. 169, 102 N.E. 1043), has been described as an intentional relinquishment of a known right. (*Shannon v. Stookey.*) As such, a party who seeks to declare an abandonment of an oil and gas lease must prove that the abandoning party intended to do so (*Gillespie v. Ohio Oil Co.*), while this element of proof is unnecessary if it is claimed that the lease has expired under its own habendum clause. *Gillespie v. Wagoner*; 2 W. Summers, The Law of Oil and Gas sec. 305 (rev. ed. 1959).

Second, we are not presented with the frequent questions of whether oil has been produced in "paying quantities" (*Gillespie v. Ohio Oil Co.*; *Metz v. Doss* (1969), 114 Ill. App. 2d 195, 252 N.E.2d 410; Annot., 43 A.L.R.3d 8 (1972)) or of whether reasonable diligence has been exercised in marketing the oil (Annot., 71 A.L.R.2d 1219 (1960)). The habendum clause in the lease at bar does not require that oil or gas be produced or marketed in any specified quantities, and, accordingly, the plaintiff's complaint alleged that there was no production of oil in any amount from the Breeze land for several years.

Third, the Breeze lease cannot be treated as having been subsumed by a unitization agreement. No Breeze owner ever agreed to unitize his or her royalty interest on any part of the 40-acre tract with that of the other lessors in the Unit, and legislation which now allows neighboring landowners to compel unitization was not in effect until October 1, 1975. (Ill. Rev. Stat. 1979, ch. 96½, par. 5440 *et seq.*) Therefore, those authorities which discuss the termination of an oil and gas lease in the situation in which the lessors enter into a unitization agreement, either voluntarily or involuntarily, are not germane to this appeal. See 2 W. Summers, The Law of Oil and Gas sec. 302.1 (rev. ed. 1959).

Fundamentally, the plaintiff's primary assignment of error consists of the argument that the length of nonproduction on the Breeze land was sufficient to declare the 1938 lease at an end, and the trial court considered extraneous factors such as the existence of the North Louden Unit and the equities of the situation in refusing to hold that the lease had terminated. The defendants respond that the concededly continuous production from the rest of the Unit acted to extend the 1938 lease, and even if this is not the case, the lack of production from the Breeze land was not of a duration to warrant termination of the lease.

■■ Normally, "to extend a lease beyond the fixed term by production,

the oil or gas must be produced from the demised land." (2 W. Summers, The Law of Oil and Gas sec. 295 (rev. ed. 1959); *Schock v. Gilpin* (E.D. Ill. 1957), 150 F. Supp. 471, *aff'd* (7th Cir. 1958), 255 F.2d 912.) Certain exceptions to this rule exist, as, for example, when a valid unitization agreement is entered into. (2 W. Summers, The Law of Oil and Gas sec. 302.1 (rev. ed. 1959).) But, as we have noted earlier, no such agreement was consummated in this case, and this exception is not applicable.

The defendants reply that production from anywhere on the unit keeps all leases in the unit alive even if there is no production from a lease which has not been the subject of a unitization agreement. In support of this theory, the defendants refer us to a number of authorities from other jurisdictions, chief among them being *Humble Oil & Refining Co. v. Hutchins* (1953), 217 Miss. 636, 64 So. 2d 733. There it was explained that

> "* * * when a drilling unit has been legally established, and there is production therefrom, so that a mineral lessor of land within the unit is entitled to receive his share of production, the primary term of the lease is thereby extended, even though the lessor has refused to agree to pooling of his interest, and the unit well is not on his land. The theory is that under such circumstances there is in effect production under the lease from the leased land, *as if the lessor had agreed to pooling of his interest, or as if the well were located on the leased land.*" 217 Miss. 636, 644-45, 64 So. 2d 733, 736-37.

The inapplicability of *Hutchins* is demonstrated by a careful reading of the passage quoted above. A lessor who does not join a unit is entitled to a share of production from the rest of the unit only if the jurisdiction involved authorizes compulsory pooling and unitization, as does Mississippi. From this fact, it follows that production from the rest of the unit may be considered as production from any lease in the unit. (*Superior Oil Co. v. Beery* (1953), 216 Miss. 664, 64 So. 2d 357.) But the defendants have provided us with no authority for this conclusion except for cases from compulsory pooling jurisdictions, or cases involving lessors who have entered into or ratified the unitization agreement. Both categories of cases are certainly no authority for us to accept this proposition in Illinois.

● 8  When the holder of a working interest or royalty refuses to sign a unit agreement, "the pre-existing oil and gas leases and other contracts of the non-signers remain in effect and unmodified by the unit agreements." (Myers, *Problems of Pooling, Unitization and Secondary Recovery*, 1959 U. Ill. L.F. 543, 554.) Consequently, a lessor who does not sign a unitization agreement is entitled to royalties only from the oil and gas produced on his leasehold, and the lessor's relationship with his lessee must be determined according to the original lease. From this description of the rights of unsigned interests, it follows that in order to extend a lease under its habendum clause where that lease is located within a unit which

the lessor has not joined, production must be from the leasehold rather than from elsewhere in the unit. (*Morris v. Mayden* (1976), 35 Ill. App. 3d 338, 341 N.E.2d 428.) Therefore, the continuous production from the rest of the North Louden Unit is of no assistance to the defendants in proving that the 1938 lease has not expired.

In determining whether production from the Breeze lease has been sufficient to keep that lease alive, we must recall the evidence concerning the state of that production. The opinion of Claude Moore that oil was last extracted from that land in 1968 was uncontradicted. Conflicting testimony was presented on the date of the resumption of production, but accepting the evidence most favorable to the appellees, we will view the first production by Tri-Star as having occurred in approximately October of 1975.

The leading case in Illinois on the termination of an oil and gas lease under its habendum clause is *Gillespie v. Wagoner* (1963), 28 Ill. 2d 217, 190 N.E.2d 765. There, a lease was executed in 1953 to be effective during its primary term "and as long thereafter as oil, gas or other mineral is produced from said land hereunder." The lessee drilled a well which produced oil and gas until September 1957. The motor was removed from the pump jack in March or April of 1958.

On March 28, 1960, the lessor issued a top lease to Don H. Baldwin, Inc. During this year, the original lessees made arrangements to put the well back into production, and they commenced this work on June 17, 1960. The following day, Baldwin served a notice of lease termination on these lessees. The lessor then brought suit to cancel the 1953 lease.

The original lessees argued that the cessation of production was only temporary and was therefore not sufficient to justify termination of the lease. The Illinois Supreme Court held:

"[T]emporary cessation of production after the expiration of the primary term is not a cessation of production within the contemplation and meaning of the 'thereafter' clause if, in the light of all surrounding circumstances, reasonable diligence is being exercised by the lessee to continue production of oil or gas under the lease." (28 Ill. 2d 217, 220, 190 N.E.2d 765, 767.)

The explanations presented by the lessees for their failure to produce oil or gas during those years were that they were in financial trouble, that it took time to contact the working interest holders, and that the weather occasionally created difficulty. Under these circumstances, the supreme court reasoned, the original lessees did not show reasonable diligence in producing the well, and thus the 1953 lease was described as having expired by its own terms.

The defendants argue that the record in this case shows due diligence by the operators of the Breeze lease, even though no oil and gas were being

produced from that land. During Troop's tenure as operator, they note, he started to develop a program which would result in the eventual change in the pattern of the waterflood. Claude Moore stated in his evidentiary deposition that dye tests were performed on all leases in the Unit, except the Breeze lease, in order to ascertain the direction of the waterflow. In the entire Unit, Troop converted a number of wells to water injection wells, including one such conversion on the Breeze lease. Troop caused certain plastic water lines to be placed on the Breeze land, but Moore testified that the water injection well was not yet functional when he left Troop in 1974.

■■ We cannot agree with the defendants that this activity constitutes reasonable diligence so as to negate the effects of approximately seven years of nonproduction from the Breeze tract. Although Troop initiated a project which was to lead to a rehabilitation of the water flooding program, the fact remains that despite the performance of some work on the Breeze lease between 1969 and 1973, the machinery was not operational either when Moore's employment with Troop terminated in 1974 or when Tri-Star took over Troop's interest in the lease a year later. If the two-year hiatus in *Gillespie v. Wagoner* operated to terminate that lease under its own terms, then we believe that the much longer period of nonproduction in this case is similarly unwarranted under the 1938 Minerva lease and is unjustified even by the work undertaken on the land during that lapse. This decision is in accord with the great weight of authority from other jurisdictions dealing with the time required before an oil and gas lease may be terminated under its habendum clause. 2 W. Summers, The Law of Oil and Gas sec. 305 (rev. ed. 1959).

■■■ Nor do we accept the position that the work performed by Tri-Star in 1975 dictates a different result. As the court noted in *Gillespie v. Wagoner*, a lessor who desires to cancel a lease for failure to continue production need not notify the lessees of his intent to do so. Once a lease is terminated in this manner, it may not be revived by commencing production simultaneously with an action to declare the original lease void. (28 Ill. 2d 217, 220, 190 N.E.2d 765, 767.) The first work performed on the Breeze lease under Tri-Star's management occurred on almost the same day that the first of the Breeze heirs signed the top lease to Belden. Tri-Star's efforts had not come to fruition by the time all of the heirs had signed the lease in early July 1975, nor by the time the document was recorded later that month. The Breeze land remained unproductive when Belden wrote to Koons in August 1975, and when he filed his complaint in September. Under these facts, the Breeze heirs were justified in treating the 1938 lease as terminated by the time they granted the top lease to Belden, and, according to the principles stated in *Gillespie v. Wagoner*, the activity undertaken by Tri-Star was ineffective to revive the terminated lease.

However, the defendants contend, even if there was no production on the Breeze land prior to the plaintiff's suit, the plaintiff must nonetheless take his top lease subject to Tri-Star's claims to the property. It is undisputed that a number of documents governing Tri-Star's interests in the land were recorded in Fayette County before the top lease was executed, and, according to the defendants, any inspection of the property between 1970, when the Breeze heirs first contacted Belden, and 1975, when the top lease was executed, would have revealed that Troop, and later Tri-Star, were making improvements on the land. This, it is stated, prevents the plaintiff from undermining Tri-Star's position on the Breeze land.

This argument does not deny our previous discussion of the expiration of the 1938 lease. Although an inspection of the various recorded documents pertaining to the land immediately prior to the drafting and execution of Belden's lease would have shown that Tri-Star had an interest in the property, observation of the land itself would have indicated that that interest was not a valid one. Contrary to the claims of the defendants, the activity visible on that land was not of such a character as would suggest the existence of a viable prior claim to the lease which was based on continuous production. Most of the signs pointed to a termination of the earlier lease, and, in accordance with this view, the otherwise invalid claim of Tri-Star to operate the Breeze lease does not become valid simply because the plaintiff knew or should have known of that claim.

Finally, in support of the decision of the trial court, the defendants assert that the Breeze heirs are barred by the doctrines of ratification and estoppel from denying the validity of the North Louden Unit and Tri-Star's rights under the 1938 lease and therefore they could not transfer any working interests in the property to Belden. First, they state that the Breeze heirs ratified the unitization agreement by accepting its benefits, and, second, they contend that they are estopped to deny Tri-Star's status as lessee because they did not object to the work performed by Tri-Star on the land in 1975 and afterwards.

As an analogy for the first of these arguments, the defendants point to *Bi-County Properties v. Wampler* (1978), 61 Ill. App. 3d 799, 378 N.E.2d 311, wherein royalty holders under an oil and gas lease were held to have been bound by a unitization agreement which they did not sign. The court stated that "[t]he acceptance of benefits under the unitization agreement by the defendants is clearly sufficient to constitute a ratification of the contract." 61 Ill. App. 3d 799, 805, 378 N.E.2d 311, 316.

Yet, the benefits accepted in *Wampler* consisted of royalty payments computed according to the figures established in the unitization agreement. In this case, the only royalties received by the Breeze heirs were based upon production from their land, and, during Troop's operation of

the lease, a majority of the heirs refused to accept even these royalties. As such, the Breeze heirs did not receive the benefits of the unitization agreement which they consistently refused to join, and their conduct was consonant with their status as nonsignatories of that agreement. They have done nothing which could be interpreted as a ratification of that agreement, and they are therefore not bound by it.

■■ The second part of defendants' estoppel argument is that the Breeze heirs may not declare the 1938 lease forfeited when they allowed Tri-Star to continue to develop the property. However, in order to maintain this argument, it must be shown that the Breeze heirs had a duty to act to prevent further development. But, as will be recalled from our earlier discussion of *Gillespie v. Wagoner*, a lessor under an oil and gas lease does not even have the obligation to notify the lessees of his intent to terminate the lease, let alone an obligation to prevent them from resuming work on the leasehold. (*Gillespie v. Wagoner* (1963), 28 Ill. 2d 217, 220, 190 N.E.2d 765, 767.) In the absence of such an obligation, we cannot hold the Breeze heirs estopped to deny Tri-Star's interests by their failure to give a notice which they were not required by law to give.

Moreover, the facts in this case indicate that much of the work was performed by Tri-Star even after it knew or should have known of Belden's claims. It is undisputed that Tri-Star's development of the Breeze land continued after the top lease to Belden was recorded in Fayette County, after Belden wrote to Tri-Star to confirm his intent to produce oil from the property, and, most importantly, even after the present suit was filed. Most of this work, we believe, was performed by Tri-Star at its peril in the face of these notices, and cannot now be asserted as an estoppel against the Breeze heirs and the plaintiff, who claims through them.

In conclusion, that portion of the plaintiff's count I which requested an injunction failed to state a cause of action, and the trial court properly denied the injunction. It was also correct in not dismissing the remainder of count I, for those parts of it which sought a declaratory judgment did state a cause of action. However, for the reasons stated above, the trial court failed to apply the correct principles in determining the validity of the two leases.

The evidence introduced at trial proves that the 1938 Minerva lease had terminated under the terms of its habendum clause and that the 1975 top lease to Belden was valid. Consequently, the contrary judgment of the trial court is reversed and this cause is remanded with directions to enter a declaratory judgment to that effect, and for further proceedings on the remaining counts of the complaint.

Affirmed in part, reversed in part, and remanded with directions.

KARNS, P. J., and JONES, J., concur.