Charles L. CAMPBELL et al., Appellants,

v.

F. A. DREIER et al., Appellees.

No. 14262.

Court of Civil Appeals of Texas.

San Antonio.

July 15, 1964.

Rehearing Denied Sept. 9, 1964.

180

E. R. Criss, Houston, Bert Kirk, Cuero, Garrett, Hodges & Stahala, Fort Worth, Lang, Byrd, Cross, Ladon & Oppenheimer, San Antonio, for appellant.

Guittard & Henderson, Victoria, Crain & Crain, Cuero, for appellee.

POPE, Justice.

Claud B. Hamill filed this interpleader suit to determine whether two term royalty deeds had terminated, and tendered all disputed royalty payments into court. Owners of the reversionary interest in the term royalties, Edmund and Fritz Dreier, urged and the trial court held, that the royalty deeds had terminated because there was no actual production on the critical dates as required by the terms of the deeds. Two questions are presented: (1) In the case of a term royalty deed which terminated on April 6, 1959, and another which terminated on March 29, 1960, if there was no paying production on the described lands, neither of which royalty deeds mentioned shut-in royalty; did the payment of shut-in royalty, as permitted by an overlying lease, preserve

the term royalty deeds? (2) Eight original co-tenants jointly granted two term royalty deeds to a described 541-acre tract, but expressly reserved executive rights. Neither royalty deed mentioned pooling with lands outside the described tract. The original owners later voluntarily partitioned the tract, and the separate owners then made leases which authorized pooling. Did actual production outside the described tract, but on lands pooled with a part of that tract, preserve the royalty deeds as to the entire tract? We answer both questions in the negative and affirm the judgment.

On October 6, 1943, F. C. Dreier and his three sons, Edmund, Fritz and Henry, joined by their wives, executed a term royalty deed to Charles L. Campbell and conveyed one-half of the royalty "in and under the following described tract of land" (describing the Dreier tract by metes and bounds). The deed would become null and void "in case there is no paying production on said land on October 6, 1958, and for six months thereafter, * * *." On March 29, 1945, the same members of the Dreier family conveyed to R. F. Scheig one-fourth of their royalty "from the following described lands" (describing the Dreier tract by metes and bounds). The Scheig deed would become null and void "IF at the expiration of said 15 years from date hereof, oil, gas or other minerals, or either of them, is not being produced or mined from said land * * *." The royalty deeds required production on April 6, 1959, in the case of

the Campbell royalty deed, and production on March 29, 1960, in the case of the Scheig royalty deed, and the production must be from the described land.

All of the Dreier grantors expressly reserved executive rights in both their royalty deeds to Campbell [1] and Scheig.[2] On July 1, 1946, the three brothers and their wives appear to be the equal fee owners of the entire tract, subject to the term royalty conveyances. On that date, the three brothers, Edmund, Fritz and Henry, joined by their wives, exchanged warranty deeds to effect a partition of their land into three equal 180⅓ acre tracts. Edmund then owned the tract on the west, Fritz the one in the middle, and Henry the one on the east. Later, Edmund made an oil and gas lease to his separate tract, and by the lease he authorized a pooling unit of 320 acres. Fritz and Henry also made separate oil and gas leases covering their tracts, and by amendments they also authorized 320-acre units. These leases were made by each brother and his wife, acting independently of the other brothers and their wives. They were made at different times and on different terms.

On July 27, 1959, a gas well was completed on the western tract partitioned to Edmund. The tract had been pooled with a part of Fritz's middle tract. The well completion date was too late to preserve the Campbell royalty deed, but was before March 29, 1960, and in time to save the Scheig royalty deed, if there was "produc-

[1]. "It is further agreed that Grantee shall have no interest in any bonus money received by the Grantor in any future lease or leases given on said land, and that it shall not be necessary for the Grantee to join in any such lease or leases so made; That Grantee shall receive under such lease or leases one-sixteenth part of all oil, gas and other minerals taken and saved under any such lease or leases, and he shall receive the same out of the royalty provided for in such lease or leases, but Grantee shall have no part in the annual rentals paid to keep such lease or leases in force until drilling is begun."

[2]. "And it is further understood and agreed that not withstanding the Grantee does not by these presents require any right to participate in the making of future oil and gas mining leases on the portion of said lands not at this date under lease, nor of participating in the making of future leases, should any existing or future leases for any reason become cancelled or forfeited, nor of participating in the bonus or bonuses which Grantor herein shall receive for any future lease, nor of participating in any rental to be paid for the privilege of deferring the commencement of a well under any lease, now or hereafter;"

tion" within the meaning of that grant. Under the facts there was not production, as ruled by the trial court. The well was shut in after completion and remained shut in until January, 1962, when for two weeks it produced fuel for other drilling purposes. It was again shut in until April, 1962, since which time it has actually produced. Another well was completed on May 27, 1959, but it too was shut in until April, 1962. There was no actual production from it until after the termination date for both of the royalty deeds. The lease permitted shut-in royalty payments, which were paid to the Scheig royalty owners up to the time of actual production.

 The word "production" as used in a term royalty deed means actual production. Holchak v. Clark, Tex.Civ.App., 284 S.W.2d 399. If shut-in royalty is relied upon as substitute production applicable to the royalty deed, provision for it must be found in the royalty deed and not in the overlying lease. This Court stated in Sellers v. Breidenbach, 300 S.W.2d 178: "The parties could have placed in their royalty deed a shut-in gas well provision, if they had desired to do so, but we find no such provision in this deed." Archer County v. Webb, 161 Tex. 210, 338 S.W.2d 435; Midwest Oil Corp. v. Mengers, Tex.Civ.App., 372 S.W.2d 247; Investors Royalty Co. v. Childrens Hospital Medical Center, Tex.Civ.App., 364 S.W.2d 779; Union Producing Co. v. Scott, D.C., 173 F.Supp. 361, affirmed, 5 Cir., 267 F.2d 469, 470.

 The royalty owners have not pointed us to any additional grant which enlarged their original royalty deeds. After the separate leases were made of the partitioned lands, the lessee obtained ratifications of the leases from each of the royalty claimants. The ratifications from the royalty owners were ratifications of the leases but they did not change the royalty deeds. Any enlargement of the grant to the royalty owners must come, not from the royalty owners but from the other direction—from the mineral fee owner.

 A third well was actually producing gas in time to preserve both royalty deeds but it was located outside the Dreier tract described in the royalty deeds. It commenced actual production on March 16, 1959. It was located 330 feet north of Henry Dreier's tract and was in a unit authorized by Henry's lease, which unit embraced some of Henry's tract. Henry does not resist the claims by the royalty owners that the term royalty deeds are still in force. Edmund and Fritz do resist, and they argue that production from a well located off the Dreier lands described in the royalty deeds, is not production "on said land" or "from said land" as required by the deeds. The phrase "from said land," in its ordinary meaning, is the same as "from wells located on said land." Southland Royalty Co. v. Humble Oil and Refining Co., 151 Tex. 324, 249 S.W.2d 914. At no time has there been production from a well located on any part of the Dreier lands.

██ ██ Every precedent which we have cited in support of the rule that the actual production requirements of a royalty deed may not be altered or enlarged by the shut-in provisions of an overlying lease, could logically be cited for the rule that lease provisions which authorize production from a well off the Dreier lands but on a tract pooled with those lands do not alter the terms of a royalty deed which contains no such provision.

 The royalty claimants, realizing that the royalty deeds have no pooling provisions, seek to find within the voluntary partition of the Dreier tract some grant of implied powers to each owner of the partitioned shares, not merely to pool, but to alter the terminating event expressed in the royalty deeds. The two term royalty deeds to Campbell and Scheig were jointly executed by four Dreiers and their wives.

They granted non-participating royalty and reserved executive rights in the entire 541-acre tract. The royalty claimants state their proposition in this manner: "The Dreier partition of July 1, 1946, vested in Henry, as the fee owner, the right to execute the Henry Dreier Lease with pooling and constructive production clauses agreeable to the owners of the royalties under his land. By said partition and their warranty deed, Fritz and Edmund authorized Henry to execute said lease with pooling and constructive production clauses agreeable to the Campbell royalty claimants."

The proposition states too much because it confuses two powers. Henry's power to lease and to make provision for a pooling unit in his lease is one power. A power to alter the terms of an outstanding royalty deed with respect to its requirements about the place of production is a different power. If a partition operates to alter the terms of a royalty deed in this particular, the terms of the written royalty deed would be of little meaning. One could never know the terms of a royalty deed if its terms, though measured out in clear words, yet depend upon the exercise of executive rights in a multitude of different ways.

The partition of the Dreier tract neither enlarged nor diminished the rights of the outstanding royalty owners. When the three Dreier brothers partitioned the 541-acre Dreier tract, they divided the property so that each would have exclusive use and occupancy and the right to dispose of his localized share as he saw fit, and as his own land. Hamilton v. Hamilton, 154 Tex. 511, 280 S.W.2d 588, 593. Before the partition, Henry owned an undivided one-third of 541 acres burdened by two term royalty grants. After the partition, he owned 180⅓ acres in fee, but still burdened with the same two term royalty grants which the partition neither reduced nor enlarged upon. Before the partition, the powers of ownership were undivided; after the partition those powers were separated and followed the ownership of the separate tracts.

The reservation of "executive rights" followed by a partition did not alter or change the rights of royalty owners under the outstanding term royalty deeds. This case well illustrates the ordinary meaning of the term "executive rights." The estate which was conveyed to Campbell and Scheig was a royalty and not a mineral interest. There was a reservation of "executive rights," which means the exclusive right to make a lease. As explained by 2 Williams and Meyers, Sec. 338: "The mineral estate had all the rights, powers, privileges and immunities after the transfer of the royalty that it had before, save one,—the right to receive all royalty on production from the land. Remaining in the grantor, therefore, is the exclusive power to lease theretofore enjoyed by him. This power, called the executive right, is an incident of mineral fee ownership, and it is not transferred by the royalty grant. There is no need to find some special classification for the executive right after transfer of a royalty any more than there is need to classify it before the royalty transfer." See W. Randolph Elliott, The Executive Right, 42 Tex.L.Rev. 865. In other words, the original grantors retained as an incident to their mineral fee ownership, the power to lease whether expressly reserved or not. This power is an incident of the mineral fee ownership whether christened or not. Giving these incidents of fee ownership a name should not confuse the problem. Whether denominated "executive powers" or not, the powers of ownership follow the mineral fee and pass upon succession, transfer, death, devise and partition of the mineral estate. Miller v. Gahagan, Tex.Civ.App., 316 S.W.2d 160; De Busk v. Cosden Petroleum Corp., Tex.Civ. App., 262 S.W.2d 767; Miller v. Speed, Tex.Civ.App., 248 S.W.2d 250, 259 S.W.2d 235. We do not have in this case a situation of a separation of executive rights from ownership of the mineral fee. The principles of agency are not involved. Willson v. Superior Oil Company, Tex.Civ.App., 274 S.W.2d 947.

■ We overrule the contention that Edmund and Fritz ratified the Henry Dreier lease and therefore forfeited their right to claim a termination of the term royalty deeds. The royalty claimants failed in their proof of ratification. Edmund and Fritz did not join in the execution of the Henry Dreier lease, nor its amendment which authorized the unit outside the Dreier lands. They did not ratify the lease, its amendment, nor the pooling unit. They refused to sign a division order which recognized the continuing rights of the term royalty claimants. They stood upon the term royalty deeds as written.

■ The royalty claimants make a final argument. They urge that Henry in executing the lease owed a duty to the royalty owners. This is true. Schlittler v. Smith, 128 Tex. 628, 101 S.W.2d 543; Jones, Non-Participating Royalty, 26 Tex.L.Rev. 569, 574. Whether that duty would justify pooling with non-Dreier lands is questionable. Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43; Nugent v. Freeman, Tex.Civ.App., 306 S.W.2d 167. The existence of a duty to protect the royalty owners does not, however, mean that an owner or holder of executive rights has the additional and new power to change the terms of oustanding royalty deeds.

In our opinion both of the term royalty deeds have terminated, and the judgment of the trial court is affirmed.