BI-COUNTY PROPERTIES, Plaintiff-Appellant, *v.* WILLARD R. WAMPLER, JR., *et al.*, Defendants-Appellees.—(ASHLAND OIL, INC., Defendant-Appellee.)

Fifth District   No. 77-437

Opinion filed June 22, 1978.

Brazitis, Croegaert, Bowen & Miller, of Olney (Paul A. Croegaert, of counsel), for appellant.

Conger & Elliott, of Carmi, for appellees.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:
Plaintiff Bi-County Properties appeals from a decree of the Circuit Court of Wayne County entered in favor of Willard R. Wampler, Jr., and Laura J. Wampler on their counterclaim for a declaratory judgment regarding the interpretation of an oil and gas lease.

Plaintiff instituted the action by filing suit seeking a declaratory judgment as to the interpretation to be given to language in an oil and gas lease reserving an overriding royalty in the assignors. The defendants filed a counterclaim also seeking a declaratory judgment as to the meaning of the contract. The issues were submitted to the court on a pretrial stipulation as to the evidence, and judgment was rendered for the defendants. Ashland Oil Company, the purchaser of the crude oil from the land operated by the plaintiff, was also joined as a defendant since it occupied the position of stakeholder of the monies which both parties claimed. Ashland Oil is not a party to the appeal.

The land to which the oil and gas lease refers is known as the Weaver Lease. In 1937, Sarah M. Weaver executed an oil and gas lease to Guy M. Wampler for 40 acres of land in Wayne County. Laura Wampler and Willard R. Wampler later acquired a portion of this interest. These rights

were assigned to Dee Miller by the three defendants in 1944 with the assignors reserving an overriding royalty interest in the oil produced. Under this reservation, the assignor-defendants were to receive one-eighth of the oil produced from the lands if the average daily production equaled or exceeded an average of 40 barrels of oil a day measured over successive monthly periods. If the production fell below a 40-barrel-per-day average, the royalty paid would drop to one-sixteenth of the oil produced. The reservation in the contract provided:

"It is also understood and agreed that as a further consideration for this Assignment, said Assignee binds and obligates himself, his heirs, successors and assigns:

1. Upon the discovery of oil on said premises, to deliver to the credit of said Assignors, in equal parts, or to their respective successors or Assigns, free of all development, equipment, operating and marketing costs and expenses, in the pipeline or storage tanks to which the well or wells on said premises may be connected, an excess or graduated overriding royalty as follows:

(a) The equal 1/8th part or portion of all oil produced, saved, and marketed from said premises so long as the daily average production from all wells on said premises for each succeeding calendar month equals or exceeds an average of 40 barrels per day; or,

(b) The equal 1/16th part or portion of all oil produced, saved and marketed from said premises when the daily average production, from all wells on said premises for a calendar month is less than an average of 40 barrels per day."

The working interest assigned to Dee Miller was further transferred until, in 1960, the lease interest was separated into two portions. F. C. Barkley was assigned the working interest in the lease below the base of the McCloskey formation with further reservation of an interest in royalties retained by the assignor. The working interest in the lease as to formations below the McCloskey formation eventually rested in the plaintiff, Bi-County Properties. Two producing wells have been established under this lease. The oil obtained under this lease is purchased by Ashland Oil Company which pays the respective parties their proportionate working or royalty interest. Both the plaintiff and the defendants signed a division order with Ashland Oil Company in 1971 which set forth the respective portions each party was to receive under the prior lease agreements.

The working interest in the lease with regard to the property above the McCloskey formation was assigned in 1965. The assignees of the interest in the lease as to the land above the formation joined in the execution of

the Johnsonville South Unitization Agreement in 1967. The unitization agreement provided for secondary recovery of oil from the land above the McCloskey formation as well as other surrounding land. It did not include the formation lying below the McCloskey formation. The defendants did not sign the unitization agreement.

The percentage of participation in the recovery under the unitization agreement was fixed at 20.529187% for the land above the McCloskey formation. The production under the unitization agreement was operated by Texaco, Inc. Texaco paid the defendants their overriding royalty interest on the basis of the production allocated to the land above the formation even though the defendants had not signed the unitization agreement. The defendants accepted the payments.

The defendants also accepted payments from Ashland Oil for their interest in the production zones beneath the McCloskey formation according to the division order executed by the plaintiff and the defendants. This arrangement lasted from December 1, 1971, the date of the execution of the division order until October 1, 1974. On that date, the defendants notified Ashland Oil of their claim that their overriding royalty interest should be based on the actual production by the Bi-County Properties wells together with the production allocated to the land above the McCloskey formation under the unitization agreement.

If the allocated production under the unitization agreement is added to the actual production from the land below the McCloskey formation, the average daily production measured on a monthly basis frequently exceeded 40 barrels a day. Under the terms of the 1944 assignment, the defendants would be entitled to receive a one-eighth overriding royalty interest for these periods rather than a one-sixteenth overriding royalty interest. During the period of the unitization agreement, Texaco has performed tests on the property above the McCloskey formation. These tests were conducted on a fairly regular monthly basis. On a certain day each month, the tests were conducted to determine the production from the land. The results were extrapolated to a 24-hour period to yield a calculated daily production. The parties stipulated that if these results were considered, the combined production under the two leases would not exceed an average of 40 barrels per day measured on a monthly basis. The plaintiff does not contend that the tests accurately measure the actual production of oil from the land.

On appeal, Bi-County Properties contends that the phrase "produced, saved, and marketed" in the 1944 assignment refers to the natural producing ability of the lands rather than to the allocated production under the unitization agreement. In addition, the plaintiff contends that the execution of the division order with Ashland Oil and acceptance of payments thereunder constitutes a ratification of the nature and extent of

the defendants' interest and estops them from claiming a larger share.

The dispute between the parties is essentially one of interpretation of the provision of the 1944 agreement. In this contract, the defendants, as lessees under an oil and gas lease, assigned their rights while retaining an overriding royalty interest in the oil "produced, saved, and marketed" from the leased lands. The plaintiff contends that "produced" must be interpreted as referring to the natural capabilities of the land while the defendant contends that "produced" must refer to that naturally produced or allocated to the land in question.

An oil and gas lease is a contract, and as such is subject to the same rules of construction as any other contract. (*Minerva Oil Co. v. Sohio Petroleum Co.*, 336 Ill. App. 372, 84 N.E.2d 167; *Carter Oil Co. v. Dees*, 340 Ill. App. 449, 455, 92 N.E.2d 519, 522.) The primary purpose of rules of interpretation and construction is to ascertain the intention of the parties at the time of the making of the contract. (*Brinkerhoff v. Ridgely*, 232 Ill. App. 12, 16; *Miller v. Ridgley*, 2 Ill. 2d 223, 226, 117 N.E.2d 759, 760.) The court may look to the circumstances of the transaction and the objects the parties had in mind as shown by the contract. *Pocius v. Halvorsen*, 30 Ill. 2d 73, 79, 195 N.E.2d 137, 140; *Smith v. Grubb*, 402 Ill. 451, 462, 84 N.E.2d 421, 426.

The secondary recovery of oil by means of repressurization was relatively new in 1944. It is not clear from the terms of the contract that the parties considered the likelihood of secondary recovery and its effect on "production" under the contractual provisions. In such a case, rules of construction are used to define the rights of the parties, keeping in mind the intent of the parties at the time of the making of the contract and the objects the parties had in mind. The assignment reserved to the defendants the right to royalty payments based upon production from the land. Since the defendants are to receive money only if oil is actually produced, the reasonable construction of the word "produced" would include oil produced by any means. Actual production from a particular piece of land is impossible to measure when secondary recovery under a unitization agreement is undertaken. In such a case, "production" is properly considered to be the amount allocated to the particular tract under the unitization agreement. Although no case factually similar to the present has been decided, the clear weight of authority is to equate actual production with allocated production when secondary recovery under a unitization agreement is employed.

In 3 Williams, Oil & Gas Law 649.2 (1964), the author notes the problem of determining production under an oil and gas lease when secondary recovery is utilized:

> "(1) If the fractional interest payable to the nonoperator varies in accordance with production from particular premises, is actual

production from such premises or allocated production the basis of the payment? * * * A leading case has taken the position, in which we concur, that where the lessor's interest is validly pooled or unitized the pooling or unitization agreement governs the production allocable to the well or tract involved and the royalty appropriate to the allocated production will be due and payable. [Citing *Beene v. Midstates Oil Corp.*, 169 F.2d 901 (8th Cir. 1948).]"

In *McLachlan v. Stroube*, 324 S.W.2d 279, 289 (Tex. Civ. App. 1959), the court noted the relationship between provisions of an oil and gas lease covering certain tracts of land and a later unitization agreement including the tract:

" 'It is a fundamental provision in all unitization agreements that unit production be allocated to the separate tracts in the unit on the basis of the percentage participation of each tract. The portion thus allocated is delivered in kind to the working interest owner of such tract, who separately disposes of the same and who is separately liable for and who, out of such allocation, accounts for all royalties and other payments which he may be obligated to account for in accordance with the terms of the respective leases or other contracts covering such tract. Such payments are based on the amount of unitized substances allocated to the tract to the same extent as if produced from said tract.' * * *

'These pre-existing contracts with reference to payment of royalty are modified only in the respect that they are to apply to allocated rather than actual production, unless otherwise specifically provided.' [Quoting Eighth Annual Institute on Oil & Gas Law, 260-61.]"

Again, in *Arkansas Louisiana Gas Co. v. Southwest Natural Production Co.*, 221 La. 608, 60 So. 2d 9 (1952), the court held that the royalty payments under pre-existing contracts were to be based on the production allocated to the particular tract under the unitization agreement.

■■ Such a construction is in keeping with the policy of the State of Illinois of promoting the secondary recovery of oil as expressed in Ill. Rev. Stat. 1975, ch. 104, par. 62 *et seq.* It is an implied right and duty of a reasonably prudent operator under an oil and gas lease to adopt a system providing for the secondary recovery of oil. (*Reed v. Texas Co.*, 22 Ill. App. 2d 131, 139, 159 N.E.2d 641, 644; *Ramsey v. Carter Oil Co.*, 74 F. Supp. 481 (E. D. Ill. 1947).) In *Carter Oil Co. v. Dees*, 340 Ill. App. 449, 456, 92 N.E.2d 519, 522, the lessee sought a declaratory judgment as to the validity of the use of the lessor's property as an input center for repressurization. The court noted that the oil and gas lease was silent as to

the method of production and was thus presumed to permit any method reasonably designed to result in the recovery of oil and the payment of royalties.

■■ Accordingly, in keeping with the weight of authority and the policy of promoting recovery of oil through secondary means, the production allocated to the land above the McCloskey Formation under the unitization agreement should be used in determining the extent of the overriding royalty interest to which the defendants are entitled under the pre-existing contracts.

■■■ The plaintiff contends the defendants cannot both refuse to sign the unitization agreement and take advantage of its benefits. While this contention may have some merit in other factual situations, it is not applicable here since the defendants have ratified the agreement by their conduct. Conduct, including an acceptance of benefits under a contract, may be sufficient to constitute a ratification binding on the party accepting the benefits as if he had signed the contract. (*North Avenue State Bank v. Nichols*, 252 Ill. App. 366.) The acceptance of benefits under the unitization agreement by the defendants is clearly sufficient to constitute a ratification of the contract. *Leopard v. Stanolind Oil & Gas Co.*, 220 S.W.2d 259 (Tex. Civ. App. 1949); *Rainwater v. Mason*, 283 S.W.2d 435 (Tex. Civ. App. 1955); *Dobbins v. Hodges*, 208 La. 143, 23 So. 2d 26 (1945).

Plaintiff also contends that the acceptance of benefits under the Ashland Oil Division Order constitutes a ratification or estoppel to claim a different interest. While this is true in a proper case, its application here would ignore the true nature of the division order. Ashland Oil is the purchaser of the crude oil extracted by Bi-County Properties from the land below the McCloskey Formation. The division order is executed to prevent disputed claims of interest in the proceeds of the oil purchased. The order is a mere recitation of the various working and royalty interests and is signed by each party claiming such an interest to prevent later actions against Ashland Oil.

■■ The order here accurately recites the interest of the defendants as a one-eighth overriding royalty interest to the extent the production exceeds an average of 40 barrels of oil per day measured on a monthly basis, declining to a one-sixteenth overriding royalty interest when production drops below this amount. The agreement does not purport to cover the method of determining the amount produced on the land subject to the unitization agreement. It cannot work an estoppel or constitute a ratification of a course of conduct it does not purport to cover. The division order might be conclusive as to a claim of a different interest by the defendants against the Ashland Oil Company (*Elliott v. Pure Oil Co.*, 10 Ill. 2d 146, 156, 139 N.E.2d 295, 301), but it is not

conclusive as to the measurement of the production necessary to determine the amount of the overriding royalty interest recited in the order. The contention is without merit and the order of the trial court is affirmed.

For the foregoing reasons the judgment of the circuit court of Wayne County is affirmed.

Affirmed.

JONES and WINELAND, JJ., concur.