EGO OIL COMPANY, INC., *et al.*, Plaintiffs-Appellants and Cross-Appellees, *v.* L. D. GARNER *et al.*, Defendants-Appellees and Cross-Appellants.

Fifth District No. 82—241

Opinion filed May 5, 1983.

Craig R. Hedin, of Campbell, Furnall, Moore and Jacobsen, P.C., of Mt.

Vernon, for appellants.

Eric L. Terlizzi, of Pfaff, Garner and Terlizzi, of Salem, for appellees.

JUSTICE KASSERMAN delivered the opinion of the court:

Plaintiffs, Ego Oil Company and the other owners of certain oil and gas leases, brought an action seeking a declaratory judgment against defendants, L. D. Garner, William D. Luttrell and Linda L. Luttrel. The Luttrels were the current owners of the real property in question at the time this litigation began. Plaintiffs requested that the trial court declare their leases to be valid and in full force and effect as to all such real property, including all geological formations covered by the leases. Plaintiffs further requested that an oil and gas lease executed by the Luttrels to Mr. Garner be declared void. The trial court found that plaintiffs' leases had terminated as to geological formations from the base of the Ste. Genevieve formation and below, and plaintiffs have perfected this appeal. Defendants have filed a cross-appeal attacking the trial court's finding that under the continuous operations clauses of the leases, plaintiffs' oil and gas leases were valid as to formations down to and including the Ste. Genevieve.

Prior to trial the parties stipulated that on February 18, 1965, the owners of certain described real estate executed oil and gas leases in favor of Ego Oil Company. These leases were for a primary term of two years and contained the following provision in the sixth paragraph:

"6. *** If, at the expiration of the primary term, oil, liquid hydrocarbons, gas or their respective constituent products, or any of them is not being produced on said land or land pooled therewith but lessee is then engaged in operations for drilling, mining or reworking of any well or wells thereon, this lease shall remain in force so long as such operations or said additional operations are commenced and prosecuted (whether on the same or successive wells) with no cessation of more than sixty (60) consecutive days, and, if they result in production, so long thereafter as oil, liquid hydrocarbons, gas or their constituent products, or any of them, is produced from said land or land pooled therewith ***."

The parties stipulated that during September 1967, the then owners of the oil and gas underlying the real property executed and delivered a unitization agreement to plaintiffs. The unitization agreement created the "Slapout Field Unit," which was defined as being all formations from the surface down to the base of the Ste. Genevieve geo-

logical formation underlying the property involved in the case at bar and other lands. The unitization agreement further provided, in part, as follows:

"6. The drilling, completion and continued operation of a well on any portion of the unit area shall be considered and construed as the drilling, completion and continued operation of a well under the terms of each lease, mineral deed, royalty conveyance or other instrument covering any portion of the unit area, and the production of oil from any separate tract in the unit shall be considered and construed as production under the terms of each lease, mineral deed, royalty conveyance or other instrument covering any portion of the unit area and shall continue each of said leases, deeds, conveyances and instruments in full force and effect as to all lands and formations covered thereby in the same manner and to the same extent as though produced from the land described in and covered by it.

\* \* \*

13. [Plaintiffs'] oil and gas leases \* \* \* as herein amended and modified, are hereby adopted, ratified, approved and confirmed and shall be and remain in full force and effect."

It was further stipulated that the Luttrells became the owners of the real estate in question in 1976 and that since the commencement date of the Slapout Field Unit, royalty proceeds attributable to the real property pursuant to production of oil from the unit area have been $4,184.11. It was also stipulated that the Luttrels have received and cashed royalty checks since some time in 1981.

Also part of the parties' stipulation were the facts that production of oil from the Slapout Field Unit has been continuous from the date of the unitization agreement; that there has been no actual production of oil from the real estate now owned by the Luttrells, covered by the 1965 oil and gas leases; and that on April 23, 1981, the Luttrells executed an oil and gas lease to L. D. Garner.

On March 18, 1982, a bench trial was held, at which Robert J. Mitchell, the president of Ego Oil Company, testified that in January 1967, the company commenced drilling operations for an oil well on defendants' property which was known as the Cullen-Todd well. Mr. Mitchell said that Ego Oil Company spent nearly $20,000 for drilling but these operations proved disappointing because mud was being recovered from the well. A report prepared by geologist John L. Lester, indicated that the well might be "closed off temporarily due to mud invasion." Mr. Mitchell testified that based upon this report the well was first treated with mud acid and, after this treatment failed to

produce results, the drilling equipment was removed from the property and a pressure gauge was then placed on the well which was monitored on a monthly basis to determine if the mud invasion had receded. Mr. Mitchell stated that on November 22, 1967, Ego Oil Company moved drilling equipment back to the well and attempted to produce oil. According to Mr. Mitchell, Ego Oil Company spent approximately $3,000 in this effort but was unsuccessful. On cross-examination, Mr. Mitchell indicated that he was not engaged in drilling, mining or reworking the Cullen-Todd well between March and November.

Walter C. Jenneman, a petroleum engineer, testified for plaintiffs. Mr. Jenneman said that in his opinion the procedures Ego Oil Company followed because of the possibility of mud invasion were an acceptable practice in the petroleum engineering field. He stated that the mud invasion could remedy itself in time and that Ego Oil Company's monitoring of the pressure in the Cullen-Todd well was an acceptable and reasonable practice under the circumstances. Mr. Jenneman further testified that monitoring the pressure in the well could be considered part of the process of reworking the well.

Marlin Crieg, also a petroleum engineer, testified for defendants. He said that merely watching the pressure in the Cullen-Todd well over a nine-month period as Ego Oil Company did would not indicate whether the well could produce oil. On cross-examination, Mr. Crieg indicated that Ego Oil Company's decision to monitor the pressure in the Cullen-Todd well and wait for the mud invasion to recede was a proper method of responding to the problem presented.

The trial court made the following findings:

"1. The oil and gas leases executed by Luttrells [*sic*] in 1965 were extended under the 'continuous operations' clauses of said leases to January 1, 1968, and thereafter as to all oil and gas covered by and included within the Slapout Field 'unit area' (meaning all formations down to the base of the Ste. Genevieve Formation), and defendants are barred by laches, ratification, waiver and estoppel from asserting the invalidity of said leases as to all formations within the 'unit area' as defined in the unitization agreement.

2. As to all formations not included within the unit area (those below the base of the Ste. Genevieve Formation) the leases of Plaintiffs have expired and are terminated. Defendant Garner's lease is valid as to all formations not included in the unit are of Slapout Field."

Defendants, in their cross-appeal, urge that the 1965 oil and

gas leases owned by plaintiffs expired prior to their inclusion in the Slapout Field Unit. They maintain that the conduct of Ego Oil Company relative to the mud invasion did not amount to "continuous operations" under the leases. It is argued that Ego Oil Company for more than 60 consecutive days after the expiration of the primary terms of the leases was not "engaged in operations for drilling, mining or reworking" without cessation as required by paragraph 6 of the leases. We find, however, that we need not consider defendant's contention. First we observe that the unitization agreement executed by defendants' predecessors expressly stated that the 1965 oil and gas leases were "adopted, ratified, approved and confirmed and shall be and remain in full force and effect." By virtue of this clause we find that if the leases had expired, they were expressly ratified and extended by the owners of the oil and gas in the unitization agreement. Defendants cannot now contend that a default by plaintiffs terminated the leases prior to this agreement. Additionally, we conclude that defendants' continual acceptance of royalties under the leases after the leases allegedly expired estops defendants from asserting that the lease had terminated. See *Walter v. Ashland Oil & Refining Co.* (1945), 300 Ky. 43, 44-49, 187 S.W.2d 425, 426-28.

■ The remaining issue, raised by plaintiffs, is whether continued unit oil production at the Slapout Field Unit perpetuated the 1965 oil and gas leases as to formations not included in the unitization agreement. We hold that it does.

■ A unitization agreement has the effect of creating a single leasehold ownership for the unitized tract. (*Ragsdale v. Superior Oil Co.* (1968), 40 Ill. 2d 68, 70, 237 N.E.2d 492, 494.) Unitization agreements are economical because they allow petroleum engineers more exhaustively to produce reservoirs of oil and gas as a natural unit without the constraints imposed by artificial property lines drawn by man. See 5 W. Summers, Law of Oil & Gas sec. 951, at 55-56 (1966).

Plaintiffs argue that both the express language in the unitization agreement and the weight of judicial authority dictates a finding that the 1965 oil and gas leases were perpetuated as to all lands and formations covered by the lease, including those outside of the unitized area. We agree.

While the unit area in this case was limited to geological formations underlying the real property from the surface down to the base of the Ste. Genevieve formation, the sixth paragraph of the unitization agreement stated that the "continued operation of a well on any portion of the unit area, and the production of oil from any separate tract in the unit *** shall continue each of said leases *** in full force

and effect as to all lands and formations covered thereby in the same manner and to the same extent as though produced from the land described in and covered by it." It is undisputed that there has been production of oil from the Slapout Field Unit without cessation from its inception. By application of the sixth paragraph of the unitization agreement, the production of oil from any location in the unit was tantamount, in law and in fact, to production from defendants' leases themselves and would perpetuate the 1965 oil and gas leases as to all the described lands and all geological formations thereunder, including all formations below the base of the Ste. Genevieve formation. The language and meaning of the sixth paragraph of the unitization agreement is unambiguous and should be given effect. See *Trawick v. Castleberry* (Okla. 1953), 275 P.2d 292, 293-94; *Bruner v. Gulf Oil Corp.* (Tex. Civ. App. 1962), 359 S.W.2d 210, 211.

■ Furthermore, a majority of courts which have had occasion to consider the question here presented have held that production of oil within a unit extends the lease beyond its primary term as to the lands covered by the lease but not included in the unitized area. (See, *e.g., Clovis v. Pacific Northwest Pipeline Corp.* (1959), 140 Colo. 552, 555-56, 345 P.2d 729, 730-31; *Trawick v. Castleberry; Le Blanc v. Danciger Oil & Refining Co.* (1950), 218 La. 463, 470, 49 So. 2d 855, 857; *Somers v. Harris Trust & Savings Bank* (1977), 1 Kan. App. 2d 397, 400-03, 566 P.2d 775, 777-79.) The rationale behind the majority rule is that since unitization provides an efficient and less expensive method of oil and gas recovery, allowing lease termination as to outside acreage would discourage unitization and this would be contrary to public policy. (*Somers v. Harris Trust & Savings Bank.*) We conclude that the majority rule is a sound one and should be followed in Illinois.

Defendants urge that we should not follow the majority rule and suggest that we distinguish between vertical and horizontal divisions of land. That is, defendants maintain that most of the cases applying the majority rule concern vertical divisions of the land based upon surface boundaries and not horizontal divisions based upon geographical formations below the surface. (See generally *Nation Oil Co. v. R. C. Davoust Co.* (1964), 51 Ill. App. 2d 225, 231-32, 201 N.E.2d 260, 263.) However, we fail to perceive the importance of the distinction which defendants attempt to draw. The public policy favoring economical use of our limited resources of oil and gas remains the same whether the lands are divided vertically or horizontally. Therefore, we conclude that production in the unitized area extended the term of the entire lease regardless of the fact that the division may be described

as being horizontal.

For the foregoing reasons, we affirm the judgment of the circuit court of Marion County insofar as it finds that the 1965 oil and gas leases were not terminated as to all geological formations from the surface down to the base of the Ste. Genevieve formation; however, we reverse the court's finding that these leases had terminated as to oil and gas formations from the base of the Ste. Genevieve formation and below.

Affirmed in part; reversed in part.

JONES and KARNS, JJ., concur.