FREDERICK F. SHELTON *et al.*, Plaintiffs-Appellees, *v.* HELEN ANDRES, Defendant-Appellant.

Fifth District   No. 82—749

Opinion filed March 2, 1984.—Rehearing denied April 6, 1984.

1090

HARRISON, J., dissenting.

Feirich, Schoen, Mager, Green and Associates, of Carbondale, for appellant.

Patrick L. Duke, of Smith, McCollum, Riggle & Moses, of Flora, for appellees.

JUSTICE JONES delivered the opinion of the court:

Defendant appeals from a judgment of the circuit court of Wayne County that quieted title in the plaintiffs to seven-twelfths interest in the oil, gas and other minerals underlying an 80-acre tract of land. The seven-twelfths interest in the oil, gas and other minerals had been the subject of a reservation in a deed of the surface of the 80 acres to the plaintiffs from defendant's predecessor. The judgment in question terminated the reservation because of the court's finding that the production of oil and gas from the 80-acre tract had ceased. Although the 80-acre tract was included in a unit organized for the secondary recovery of oil and unit operations and production had continued throughout the pertinent time-span, the court found that production of oil and gas from the 80 acres had ceased when the pump and other equipment used for primary production of oil and gas were removed from the 80 acres so that the actual lifting of oil to the surface no longer occurred on the 80-acre tract. The issue presented in this appeal is whether, where unit production was from wells off the

tract, the secondary recovery of oil and gas from the unitized pool constituted production from the 80-acre tract so as to extend the reservation of the seven-twelfths interest as continuous production. We hold that it did and reverse.

The facts are furnished in a stipulation of the parties and a deposition of the unit operator that was submitted as evidence by agreement. S. D. Broyles was the owner of the surface and seven-twelfths interest in the oil, gas and other minerals in the 80-acre tract on July 16, 1962. On that date he and his wife conveyed the tract to the plaintiffs. The deed contained the following habendum clause:

"The Grantor, S. D. Broyles expressly reverses from this conveyance and unto himself, his heirs and assigns, all of his undivided interest in and to all of the oil, gas and other minerals lying in, on and under, and that may be produced from said described real estate as long as there is production on said described real estate. When said production of oil on said described real estate ceases production, said interest owned by the said Grantor in the above described real estate reverts to the said grantees herein."

At the time the deed was executed and delivered there was a producing oil well on the land. The well continued in production, and S. D. Broyles received his portion of the royalty payments from it, until on or about June 1, 1964, when the 80-acre tract became a part of the Sycamore Unit, organized for the secondary recovery of oil by waterflood. The participation factor assigned to the 80-acre tract was 13.70745% of the oil produced from the unit. S. D. Broyles, as a royalty owner, signed the unitization agreement, but the plaintiffs did not. Following the unitization, S. D. Broyles continued to receive royalty checks, but they were paid to him by virtue of participation in the unit operation and were not based upon the oil lifted to the surface through the pump and other production equipment located on the 80-acre tract. The unit operator continued to utilize the well located on the 80 acres in question for production from the unitized pool until on or about May 1, 1973. At that time further production through that well became impractical, presumably because of the encroachment of water being injected into the formation to generate the secondary recovery.

By deed dated December 9, 1971, S. D. Broyles placed the seven-twelfths interest in the oil, gas and other minerals in the 80-acre tract in joint tenancy with himself and Helen Andres. S. D. Broyles subsequently died, leaving Helen Andres the sole owner of the seven-twelfths interest that was the subject of the reservation.

Plaintiffs filed a complaint on May 31, 1978, to quiet title in themselves to the seven-twelfths interest in the oil, gas and other minerals. The essential allegations of the complaint were that at the time of the deed to the plaintiffs there was one producing oil well on the land. Sometime prior to September 1973, production of oil from that well permanently ceased, and by virtue of the condition expressed in the deed from S. D. Broyles to themselves, the seven-twelfths interest in the oil, gas and other minerals "reverted" to them. Defendant filed an answer and affirmative defenses that, in essence, asserted that at all times relevant to the complaint there was continuous production from the 80-acre tract because it was a constituent part of the Sycamore Unit and that so long as production from the unit continued, the reservation of oil, gas and other minerals in the deed to plaintiffs remained in effect. Upon motion by plaintiffs, the court entered an order on November 25, 1981, striking defendant's affirmative defenses. The order included a finding pursuant to Supreme Court Rule 304(a) (87 Ill. 2d R. 304(a)) that there was no just reason for delaying an appeal of the order.

The case was subsequently submitted to the court for decision upon the stipulation of facts and the unit operator's deposition. They show, in addition to other facts already related, that during 1974, 1975 and 1976, no oil or gas was produced from any well located on the 80-acre tract although oil was continuously produced from wells located on other tracts within the Sycamore Unit and that defendant regularly received royalty payments by reason of the unit production allocated to the 80-acre tract. Further, on or about May 8, 1977, a new well drilled on the 80-acre tract commenced production, and on or about February 8, 1978, production was resumed from the original well on the 80-acre tract, but such resumed production was from a new, deeper formation that had been reached by additional drilling and was not being subjected to secondary recovery. Thus, from about May 1, 1973, until May 8, 1977, no oil or gas was physically brought to the surface from any location on the 80-acre tract.

In rendering its judgment quieting title to the seven-twelfths interest in the oil, gas and other minerals in the plaintiffs, the court found that from approximately three to four months prior to September 1973 to on or about May 8, 1977, there was no production of oil, gas or other minerals from the 80-acre tract and that any former production of oil, gas or other minerals had permanently ceased. By virtue of the cessation of production of oil, gas or other minerals from the 80 acres, the seven-twelfths interest formerly owned by defendant terminated and, pursuant to the deed in question, that interest was

vested in plaintiffs as of September 1, 1973. The court further found that plaintiffs were entitled to the proceeds of any oil and gas produced and sold after May 8, 1977, but not before, including such proceeds held by a trustee *pendente lite*. The dispositional portion of the judgment was in accord with the court's findings as related.

■■ We initially consider plaintiffs' contention that we are without jurisdiction to consider the issues raised by defendant's affirmative defenses. Those issues relate to the extension of the reservation of the seven-twelfths interest by the continued production of oil and gas from the Sycamore Unit and, plaintiffs argue, were foreclosed from further consideration when defendant did not appeal the order striking affirmative defenses. We find, however, that plaintiffs' argument regarding the issues raised by defendant's affirmative defenses is not well taken. The order striking the affirmative defenses was not final because it did not determine the litigation on its merits so that, if affirmed, the only thing remaining would be to proceed with execution on the order. (*Flores v. Dugan* (1982), 91 Ill. 2d 108, 435 N.E.2d 480.) The order striking the affirmative defenses was interim in nature. The fact that the trial court made a finding pursuant to Supreme Court Rule 304(a) that "there is no just reason for delaying appeal of this order" does not confer finality upon an order that is otherwise not final. (*Crane Paper Stock Co. v. Chicago & Northwestern Ry. Co.* (1976), 63 Ill. 2d 61, 344 N.E.2d 461; *Petruchius v. Don Roth Restaurants, Inc.* (1979), 79 Ill. App. 3d 1071, 398 N.E.2d 1228.) Accordingly, the appeal from the judgment draws into consideration all prior interim orders and rulings that produced the judgment. *Burtell v. First Charter Service Corp.* (1979), 76 Ill. 2d 427, 394 N.E.2d 380.

We would note parenthetically that we have been cited authority that relates to unitization or pooling of tracts for the purpose of creating a drilling or spacing unit for primary production. Although, strictly speaking, "pooling" refers to the consolidation of multiple tracts for purposes of forming a drilling or spacing unit, and "unitization" refers to a consolidation of tracts for joint operation of all or part of a reservoir, the terms often are used interchangeably. (5 W. Summers, Oil & Gas sec. 951 (1966); compare 1 W. Summers, Oil & Gas sec. 76 (1954).) The rules that attend the formation and operation of units formed for drilling or spacing purposes may or may not pertain to the consequences that flow from unitization of tracts for secondary recovery purposes. We make note of the distinction between the purposes attending unitization so as to be aware of the different applications that might pertain.

As regards the principal issue in the case, there is no direct Illi-

nois precedent. The parties cite and discuss the application of four cases of this court: *Ego Oil Co. v. Garner* (1983), 115 Ill. App. 3d 82, 450 N.E.2d 375, *Belden v. Tri-Star Producing Co.* (1982), 106 Ill. App. 3d 192, 435 N.E.2d 927, *Bi-County Properties v. Wampler* (1978), 61 Ill. App. 3d 799, 378 N.E.2d 311, and *Morris v. Mayden* (1976), 35 Ill. App. 3d 338, 341 N.E.2d 428. We have re-examined those cases with the issue presented by the instant case in mind and have determined that they strongly indicate the conclusion that production of oil and gas from the 80-acre tract in question has not ceased, that the defendant continues to be the owner of the seven-twelfths interest in the oil, gas and other minerals underlying the tract, and that the plaintiffs' interest continues to be executory in nature and unrealized. Not cited, but nevertheless somewhat pertinent, is the supreme court case of *Dickerson v. Ray* (1960), 20 Ill. 2d 107, 169 N.E.2d 341. In that case a conveyance of one-half interest in the oil and gas under two separate tracts was made in one deed. The conveyance was for a stated term and "as long thereafter as oil or gas or both shall be produced therefrom." Within the stated term, both tracts yielded production. After the expiration of the stated term production ceased on one tract but continued on the other. The case considered the issue of whether the continuous production on the second tract served to extend the ownership of the grantee of the deed on one-half interest of the oil and gas in the first tract. The supreme court held that it did:

> "Arising first in decisions relating to oil-and-gas leases, it is the rule of the vast majority that where a number of land owners demise their lands in a single lease, where contiguous or not, and provide that after a designated period the interest covered by the said instrument will continue for as long as there is production upon said land, production which is sufficient to continue the interest as to any of the land described is sufficient to continue the interest as to all of the land described." (*Dickerson v. Ray* (1960), 20 Ill. 2d 107, 113-14, 169 N.E.2d 341, 344.)

Although not concerned with unitization for secondary recovery operations, cases from other jurisdictions nevertheless would provide support for the result we reach. *Panhandle Eastern Pipe Line Co. v. Isaacson* (10th Cir. 1958), 255 F.2d 669; *Classen v. Federal Land Bank* (1980), 228 Kan. 426, 617 P.2d 1255; *Southland Royalty Co. v. Humble Oil & Refining Co.* (Tex. 1952), 249 S.W.2d 914.

■■ Further analysis of the foregoing cases is unnecessary, however, because of our finding that the outcome of this case is controlled by a statute, section 23.2(a) of "An Act in relation to oil, gas, coal

and other surface and underground resources \*\*\*," commonly called the Oil and Gas Conservation Act (Ill. Rev. Stat. 1977, ch. 96½, par. 5439(a)). Section 23.2(a) was added to the Act in 1951 and was amended to its present form, effective June 29, 1953. It provides:

"When two or more separately owned tracts of land are embraced within a pool or a portion of a pool suitable for secondary recovery methods, the owners thereof may validly agree to integrate their interest therein and to develop their land as a unit, and production from any tract in such established unit shall be regarded as production from all presently owned tracts or interests within such units."

This statute expressly denotes its application to voluntary unitization for secondary recovery purposes and expressly provides that production from any tract in the unit shall be regarded as production from each tract in the unit. Section 23.2(b) further states that subsection (a) applies to every nature of ownership in the oil and gas pool unitized for secondary recovery. The application of section 23.2(a) cannot be denied. It was adopted long before any of the transactions pertinent to this case took place, and the parties must be deemed to have incorporated the provisions of the statute into the terms of their transaction.

Statutory provision was made for a measure of involuntary unitization when the Illinois legislature enacted sections 23.3 through 23.16 of the Oil and Gas Conservation Act, effective October 1, 1975 (Ill. Rev. Stat. 1977, ch. 96½, pars. 5440 through 5453). Although these sections of the Act are not applicable to this case, they nevertheless serve to illustrate the public policy that fostered both statutes. That public policy is to obtain the maximum recovery of oil and gas from a common pool irrespective of the separate ownership interests in that pool measured by overlying surface boundaries and interests. In section 23.15, subsection 3 and 4, it is specified that production from unitized tracts is to be allocated and paid to the several persons entitled upon the basis of their participation in the separately owned tracts of the unit in the same manner as though the unit had not been organized and, furthermore, that wells drilled or operated on any tract in the unit are to be regarded as wells drilled on each separately owned tract within the unit.

Many engineering studies, along with many practical applications, have conclusively established that secondary recovery of oil and gas results in production greatly in excess of production by primary recovery methods. From this salient fact flows the public policy that encourages and, in the case of the statutes providing for involuntary un-

itization, demands unitization and secondary recovery. In making provisions for both voluntary and involuntary unitized operations for secondary recovery of oil and gas from a common pool, the legislature has obviously pursued a policy that will maximize production while assuring continuity of ownership and participation. In the secondary recovery process the secondary recovery medium, in this case, water, is injected into the common pool in such a manner that it will drive oil and gas from all the tracts in the unit to the recovery wells. The process necessarily removes oil and gas from all the tracts comprising the unit, and, thus, the production from each tract in the unit is continuous until all production of oil or gas from the unit ceases. In assuring continuity of ownership of the interests in the separate tracts which comprise the unit, the statutes are but affording legal recognition to the physical facts of the secondary recovery process whereby the oil and gas underlying every common owners tract is driven to optimum recovery wells for the pool.

██ In furtherance of policy considerations, and in recognition of the application of the statute regarding voluntary unitization, we hold that production from the 80-acre tract in question never ceased but that it has been at all pertinent times continuous. Brief reflection will show the rationale for the conclusion we reach. The creation of interests in oil and gas rights by grant or reservation, for terms that remain extant "so long as production continues from said land" are commonplace. Owners of such interests, doubtless including S. D. Broyles in this case, would never agree to subject their ownership to unitization for secondary recovery purposes, for, as soon as oil or gas ceased to be lifted to the surface of the tract of their interest, their participation in the production would terminate. Their best interest would be to string along with the faltering primary production, thus reasonably and understandably choosing something over nothing. In the absence of statutory provisions such as section 23.2(a) or a comparable common law rule, unitization for secondary recovery purposes would all but cease and much oil production would be lost, to the obvious great detriment of the public.

██ It is of no consequence that the plaintiffs did not sign the voluntary royalty owners' unitization agreement. They had no interest to be committed to the formation of the unit. They could have no interest until production ceased, and it never did. The parties are in agreement, and we also agree, that the plaintiffs' interest was executory and, therefore, they had no ownership for the duration of unit production, or for the duration of any further production from the newly drilled or deepened wells on the 80-acre tract. So long as there is con-

tinuity of production from the unit, or otherwise, the interest in the seven-twelfths interest in the oil, gas and other minerals in question remains in defendant's ownership and control.

We cannot refrain from noting the incongruity in plaintiffs' claim that the seven-twelfths interest in the 80 acres is theirs because production ceased on or about May 1, 1973, but that they are entitled to the royalties that have accrued to that interest by reason of the unit production subsequent to May 1, 1973. Plaintiffs seem to lay some stress on the language in the reservation that relates that the grantor reserved the seven-twelfths interest so long as oil and gas are produced "on said land." Oil and gas are, of course, always produced from under the land, never "on" it. The incongruity arises from the fact that the source of the oil being produced has throughout remained the same, the oil-bearing formation that underlies the surface. The accrued royalties plaintiffs sought and received in the judgment were produced "from" the land, just as the royalties from the primary production were produced "from" the land.

The original oil and gas lease remains in effect. Indeed, the plaintiffs do not even attack the validity of the lease, which was also originally given for a stated term "and so long thereafter as oil and gas are produced." The plaintiffs seek only to substitute themselves for the lessors because production has ceased "on said land." It should be manifest that if defendant's interest has terminated, so has the oil and gas lease from which plaintiffs now claim royalties.

Reversed.

KASSERMAN, J., concurs.

JUSTICE HARRISON, dissenting:

In my view the majority's conclusion that section 23.2(a) of the Oil and Gas Conservation Act is dispositive of this appeal operates to sidestep the question presented, and not to answer it. There is, of course, no question that owners may validly agree to integrate their interests in their land for purposes of oil production, and that, once this has been done, production from any single tract is construed as production from the unit for the obvious purpose of dividing up profits and expenses. It does not follow, however, that the unitization agreement operates as a device to insulate participants from the effects of preexisting clauses in the deeds by which they have acquired or retained their interests in the participating tracts. Accordingly, I

dissent.

While the majority stresses the policy considerations favoring the promotion of oil production and recovery, those policy considerations do not and cannot dictate the proper result here. When Broyles conveyed his land to plaintiffs in 1962, two years before the unitization agreement was signed, he reserved to himself the mineral interest in the land for "as long as there is production on said described real estate." It is axiomatic that a deed should be construed most favorably on behalf of the grantee (*Logue v. Marsh* (1977), 50 Ill. App. 3d 493, 496, 365 N.E.2d 1159), and I know of no Illinois precedent for relaxing this rule on the basis that the subject land contains oil. Thus, the question presented is fundamentally one involving construction of a deed, and it is the deed itself, and not the importance of oil production, which we must look to in order to determine the appropriate result.

When the legal principles pertaining to deed construction are applied to Broyles' reservation of the mineral interest in the conveyed property, I believe that we must conclude, as did the trial court, that the reservation terminated in 1973, when the well physically located on the land stopped producing oil. While no Illinois case has focused precisely on this issue, at least one Texas court has held that the phrase "production on said land" means, in its ordinary use, production from wells physically located on the land in question. (*Campbell v. Dreier* (Tex. Civ. App. 1964), 382 S.W.2d 179, 182.) In my view, this is the interpretation most appropriately given to the reservation here, particularly since, as noted above, the deed must be construed most strictly in favor of the grantee, and hence most strictly against an expansive reading of Broyles' reservation. This conclusion is buttressed by the fact, noted by the majority, that the statute permitting unitization agreements was in effect well before the time of the conveyance from Broyles to plaintiffs. A unitization agreement was certainly not unheard of in 1962; had Broyles wished to reserve the mineral rights in the Shelton land for as long as production either came from wells on the land or was allocated to the land by virtue of its participation in a unitization agreement, he could easily have expressed such an intention in the 1962 deed.

Additionally, I cannot agree with the majority's cryptic observation that the Illinois cases discussed by the parties "strongly indicate the conclusion" that production from the tract has not ceased. In my opinion, these cases are either distinguishable from the case at bar or in fact contrary to the majority's position.

In *Belden v. Tri-Star Producing Co.* (1982), 106 Ill. App. 3d 192,

204-05, 435 N.E. 2d 927, we noted:

> "[A] lessor who does not sign a unitization agreement is entitled to royalties only from the oil and gas produced on his leasehold, and the lessor's relationship with his lessee must be determined according to the original lease. From this description of the rights of unsigned interests, it follows that in order to extend a lease under its habendum clause where that lease is located within a unit which the lessor had not joined, production must be from the leasehold rather than from elsewhere in the unit. (*Morris v. Mayden* (1976), 35 Ill. App. 3d 338, 341 N.E.2d 428.)"

While the instant case involves the reservation of mineral interest in a grantor by way of an habendum clause in a deed, I believe that the principles articulated in *Belden* apply with equal force here. Just as the lessor's relationship with the lessee in *Belden* had to be determined with reference to the original lease, so must the relationship between plaintiffs and defendant here be analyzed with reference to the 1962 deed defining that relationship. Here, plaintiffs did not join in the unit, and permitting use of allocated mineral production to extend defendant's mineral interest in the Shelton land operates to defeat the intentions of Broyles and plaintiffs as expressed in the 1962 deed.

Additional support for a result contrary to that reached by my colleagues may be found by reference to our decision in *Morris v. Mayden* (1976), 35 Ill. App. 3d 338, 341 N.E.2d 428. In *Morris*, the plaintiffs acquired fee simple title to certain real estate, subject to a 1957 reservation in which defendants Mayden had reserved to themselves all mineral interests in the land "for the period which the present oil and gas lease to the Pure Oil Company, a corporation, remains in effect," and further reserved in themselves an undivided one-half interest in minerals produced from the property at any time following termination of that lease. Subsequently, Pure Oil Company assigned its interests under the lease to Union Oil, and, in 1968, Union, Maydens and certain other parties entered into a unitization agreement. In their complaint, plaintiffs sought, among other things, money damages against defendants Mayden for oil and gas alleged to have been wrongfully appropriated from the time of the unitization agreement until the filing of the complaint. In affirming the trial court's dismissal of the complaint, this court relied upon the fact that the complaint failed to allege that production had ceased from the land in question:

> "The plaintiffs' interest becomes possessory upon the termi-

nation of the oil and gas lease between defendants Mayden *et al.* and the Pure Oil Company. This lease, although amended and assigned, still remains operative. By the express terms contained in the lease it remains 'in force' for 'as long *** as oil or gas or either of them is produced from said land by lessee.' As observed by Professor Summers in his treatise on Oil and Gas law, 'the term cannot be extended by a pooling or unitization in which the holder of the reversion upon the term interest is not joined *unless production is from the term* acreage ***.' (5 Summers, The Law of Oil and Gas 96 (1966.) (Emphasis supplied.) Consequently, in view of the absence of any allegation that production has ceased from such land (the term acreage), the trial court was correct in dismissing plaintiffs' amended complaint." *Morris v. Mayden* (1976), 35 Ill. App. 3d 338, 341-42.

While *Morris* came before us in a different procedural posture than does the instant case, I believe that what we said in that case constitutes at least an implicit, and a correct, rejection of the position taken by the majority here. Like the lease between Mayden and Pure Oil Company, the mineral interest retained by S. D. Broyles in the 1962 deed in this case was to last only so long as there was mineral production from the subject land. Had we taken the view in *Morris v. Mayden* (1976), 35 Ill. App. 3d 338, 341 N.E.2d 428, that production from other lands which were part of the unitization agreement could constitute production from the subject land for purposes of perpetuating the lease, the absence of an allegation that production on the term acreage has ceased would not alone have been dispositive of the entire case; instead, we would have been required to examine the additional question of whether plaintiffs' complaint also alleged the absence of allocated production from the unitization agreement. Our failure to require such additional examination, and our adherence to the rule articulated by Professor Summers, indicate our past unwillingness to extend the meaning of the term "production" in a manner which would override the expressed intentions of the parties to the original deed or lease.

The cases relied upon by defendant are distinguishable. Neither *Ragsdale v. Superior Oil Co.* (1968), 40 Ill. 2d 68, 237 N.E.2d 492, nor *Bi-County Properties v. Wampler* (1978), 61 Ill. App. 3d 799, 378 NE.2d 311, dealt with situations in which the holders of a "reversionary" interest in minerals had not, either by express consent or by ratification, become parties to a unitization agreement in which the current mineral interest holder had joined. The *Bi-County* case arose in

the context of determining the amount of royalty payments owed to an undisputed holder of a royalty interest, and did not deal with the more fundamental question of what person or persons owned the mineral interest itself. Thus, the rule relied upon in *Morris v. Mayden* (1976), 35 Ill. App. 3d 338, 341 N.E.2d 428, and directly applicable to this case, was not a relevant factor in *Bi-County*, where all litigants had consented to the unitization agreement either by written agreement or by actions amounting to a ratification. (61 Ill. App. 3d 799, 805.) *Ragsdale v. Superior Oil Co.* (1968), 40 Ill. 2d 68, 237 N.E.2d 492, also does not mandate the result reached by the majority herein. While the court in *Ragsdale* recognized that a unitization arrangement "creates a single ownership of the entire unit by the owners of the several tracts making up the unit" (40 Ill. 2d 68, 70), it does not follow that participation in a unit operates to insulate the owner of the mineral interest in each single tract from the operation of clauses contained in the deed by which he has acquired or reserved his mineral rights.

Defendant's reliance on *Ego Oil Co. v. Garner* (1983), 115 Ill. App. 3d 82, 450 N.E.2d 375, is also misplaced. In *Ego Oil*, we held that "production of oil within a unit extends [a] lease beyond its primary term as to the lands covered by the lease but not included in the unitized area." (115 Ill. App. 3d 82, 87.) While this rule governs the relationship between a lessor and lessee regarding continuation of the lease, I cannot see how it would operate to permit the lessor to expand his own interest in the land at the expense of the other party to the deed by which he has acquired or retained his own mineral rights. As recognized in a similar context in *Scott v. Union Producing Co.* (5th Cir. 1959), 267 F.2d 469, 470, *"It is the mineral deed, not the lease,* that should have contained a provision securing to the term mineral owners the benefit of a shut-in *** provision."

These authorities, coupled with proper analysis of the deed by which S. D. Broyles created and retained the mineral interest at issue, compel the conclusion that the judgment of the trial court is correct. The maximization of oil production, while a salutary goal, has not until today been allowed to override the fundamental right of our citizens to convey their property as they see fit, or the fundamental responsibilities of our courts to fairly interpret and enforce the terms of those conveyances.

I dissent.